The STATE of Ohio, Appellee,

v.

JULIAN, Appellant.

[Cite as *State v. Julian* (1998), 129 Ohio App.3d 828.]

Court of Appeals of Ohio,
First District, Hamilton County.

No. C-970538.

Decided Sept. 18, 1998.

*Joseph T. Deters,* Hamilton County Prosecuting Attorney, and *Ronald W. Springman, Jr.,* Assistant Prosecuting Attorney, for appellee.

*Douglas M. Mansfield,* for appellant.

HILDEBRANDT, Judge.

## I. Factual Background

On January 25, 1997, two men wearing masks entered a Kentucky Fried Chicken restaurant prior to its regular business hours and demanded money from the manager on duty. The men had guns, which they pointed at the manager, Tanisha Poellnitz. Poellnitz turned over all of the money that was available. Another employee, Cedric Wilson, was in the store at the time, but Poellnitz did not see him while the robbery was taking place.

A third employee, Zakia Rashid, arrived at the store while the robbery was in progress. She could see the two men from the front door, and she immediately returned to her mother's car and told her mother what was happening. Rashid and her mother drove to a nearby telephone and called 911. They both saw two men running across the parking lot of the shopping center where the restaurant was located. Rashid reported the robbery, but she did not identify either of the perpetrators.

When the robbers saw Rashid, they left the store through the drive-through window. Poellnitz called 911 and reported the robbery. She described the two men but did not state that she recognized either one of them. Shortly thereafter, the police arrived and began questioning the witnesses. The police report submitted from the interview with Poellnitz contained Poellnitz's description of the robbers as well as her stated belief that her coemployee, Wilson, was involved in the robbery in some way. At some point in the interview, she stated that she thought she recognized the voice of one of the robbers as that of defendant-appellant Alfred Julian.

After the date of the robbery, one of the police officers assigned to the case went to Rashid's high school and had her summoned from class to meet with him privately. At that meeting, Rashid signed an affidavit in which she declared that she recognized the two men who had robbed the store as Julian and Mitchell Workman.

Wilson was interrogated several times about the robbery after Poellnitz indicated that she thought that he was involved in the offense. Ultimately,

Wilson gave a taped confession to the police indicating his involvement in the robbery scheme and implicating Julian and Workman. Wilson claimed that he was supposed to unlock the front door for Julian and the other man, but claimed that he did not do so because the door was already unlocked. He denied any other involvement. Based on the statements by Poellnitz, Rashid and Wilson, Julian was arrested and charged with robbing the store.

II. Trial Testimony and Evidence

At trial, Poellnitz and Rashid both stated that they did not recognize either of the two masked men who robbed the restaurant. While each acknowledged that she had told a police officer that Julian was involved, each testified that her identification was based on information told to her by someone else. When Poellnitz and Rashid repudiated their previous identifications, the state was permitted to use their prior statements to show that their trial testimony conflicted with the information they had given to the police. However, each adamantly maintained at trial that she could not identify Julian as one of the robbers.

The state also attempted to call Wilson and Workman to testify at Julian's trial. Both claimed a Fifth Amendment privilege to refuse to testify, which the trial court acknowledged. The state then called to the stand the police officer to whom Wilson had made his confession and had the officer identify the tape on which the confession was recorded. The state requested that the tape be played for the jury.

Counsel for Julian objected. There ensued repeated, lengthy arguments regarding the admissibility of the taped statements. The state claimed that the statements were admissible under Evid.R. 804(B)(3), since the declarant, Wilson, was unavailable to testify and the taped statements were against Wilson's penal interest. Counsel for Julian argued that some but not all of the statements by Wilson were against his penal interest, and that the tape should not be played for the jury. The trial court ruled that the statements on the tape were against Wilson's interest and that adequate indicia of reliability existed to permit admission of the statements.

Julian was found guilty of robbery and aggravated robbery. He appeals from his convictions, raising three related assignments of error.

III. First Assignment of Error: The Trial Court Erred by Permitting the Taped Statements of a Co–defendant to be Played to the Jury

Julian claims that the trial court erred when it allowed the state to play the taped statements of Wilson, who refused to testify at trial, because the out-of-court statements were inadmissible hearsay. Julian argues that admission of these statements violated his right to confront the witnesses against him as

secured by the Ohio and federal Constitutions. The trial court permitted the admission of Wilson's statements pursuant to Evid.R. 804(B)(3) and *State v. Gilliam* (1994), 70 Ohio St.3d 17, 635 N.E.2d 1242.

Evid.R. 804(B)(3) states:

"(B) Hearsay exceptions. The following are not excluded by the hearsay rule if the declarant is unavailable as a witness:

"* * *

"(3) Statement against interest. A statement that * * * at the time of its making * * * so far tended to subject the declarant to civil or criminal liability, * * * that a reasonable person in the declarant's position would not have made the statement unless the declarant believed it to be true. A statement tending to expose the declarant to criminal liability, whether offered to exculpate or inculpate the accused, is not admissible unless corroborating circumstances clearly indicate the trustworthiness of the statement."

The admission and use of one co-defendant's statements against another was directly addressed by the Supreme Court of Ohio in *State v. Gilliam*,[1] the case upon which the trial court primarily based its decision. The Ohio Supreme Court relied heavily on United States Supreme Court precedent in holding that an out-of-court statement made by a co-defendant was admissible against the other defendant, without violating the Confrontation Clause, when the defendants were accorded separate trials.[2] According to the court in *Gilliam*, "the Confrontation Clause requires a showing that [the declarant] is unavailable and that the statement bears adequate 'indicia of reliability.'"[3] Following United States Supreme Court precedent, the *Gilliam* court held that "[t]he reliability standard can be satisfied without more in a case where the evidence falls within a firmly rooted hearsay exception."[4]

In *Gilliam*, Moore was a co-defendant in a robbery case, and he informed the police that he, Gilliam and another person, Treadwell, drove to a store with the intent to rob it. He also stated that he stayed in the car until Gilliam and Treadwell returned with the money, and then the three of them left. Moore

---

1. *State v. Gilliam, supra.*

2. The admission of a co-defendant's statement against the defendant when the two are tried together in a joint trial presents concerns not at issue in cases like this one, where the defendants are tried separately. See *Bruton v. United States* (1968), 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476; *State v. Moritz* (1980), 63 Ohio St.2d 150, 407 N.E.2d 1268.

3. *Gilliam*, 70 Ohio St.3d at 19, 635 N.E.2d at 1245.

4. *Id* at 19–20, 635 N.E.2d at 1245.

refused to testify at Gilliam's trial, citing his Fifth Amendment right to refuse to provide evidence that tended to incriminate him.

Moore's refusal to testify made him "unavailable" for the purposes of the hearsay rule. The court held that his statements, referred to above, fell within the hearsay exception that permits admission of "statements against interest," Evid. R. 804(B)(3). Since Moore's statements regarding his involvement in the robbery tended to subject him to criminal liability, the court held that his confession to the police constituted a "statement against interest" and was therefore admissible against Gilliam without violation of the Confrontation Clause.

■ In this case, the court permitted, over defense counsel's objections, the admission of the entire colloquy between the investigating officer and Wilson. Review of the tape reveals that Wilson's statements, like Moore's statements in *Gilliam,* tended to subject him to criminal liability. The exchange occurred as follows (exactly as the transcript of the tape reads):

"[Officer]: Ok, why don't you tell me from the beginning to end what took place and who all was involved?

"[Wilson]: Ah right, it started like (pause) ya undastand, we woke up I mean I got up, ya undastand and I met, met up with [Julian], ya unnastan, over a, ya unnastan I met up with [Julian] like he was walking down the street, and ya know I just met him up in the court. An den we drove up da street and [Workman] he was walkin down da street. Ya unnastan, den we went back down ta [Workman's] house, Ya unnastan, and den, I went to work. Then [Julian]* * *.

"[Officer]: How'd ya get to work?

"[Wilson]: They dropped me off.

"[Officer]: In your car?

"[Wilson]: Yeah.

"[Officer]: Ok, go ahead.

"[Wilson]: An then, ya unnastan they left, I mean they left and went back to [Workman's] house, to get the guns. Then they came back. Then they came in * * * ya unas * * * they came in cause the door was already unlocked. They just came in, bofe of um came over the counter * * * and then [Julian] told him to get down, ya unnastan, cause he was on top of the counter fa too long, ya unnastan, pointin a gun. Then they came in and told Tanisha to rob * * * to open the safe * * * an den * * * they * * * I guess they robbed * * * I * * * I didn't know nothin about dey robbed * * * dey robbed her purse. Ya uunnastand, then Zakia * * * she came in through the door * * * seen them * * * she they seen her an went through the drive-thru window. An den when they went

around, when they went around the buildin, ya unnastan Zakia was goin across the lot * * * an ya unnastan they had already took their masks off, ya unnastan. An Zakia know um just as well as * * * as well as I do, so she know um from face description anytime anywhere, so * * *

"[Officer]: Ok an who are the other two, Alfred Julian * * *.

"[Wilson]: Alfred Julian and Mitchell Workman.

"[Officer]: Ok * * * and was it the, when was it was it that you guys had talked about it or when was that?

"[Wilson]: Yeah, it was like ya unnastan it just came up * * * out da blue.

"[Officer]: Ok * * * that they were gonna do it Saturday morning that morning * * *.

"[Wilson]: Naw it wadn't even like, it was like any time, morning or night, whichever came first.

"[Officer]: Ok * * * but your job was ta unlock the door but you didn't have ta unlock * * *.

"[Wilson]: I didn't * * *.

"[Officer]: Cause it was already unlocked.

"[Wilson]: It was already cause like when I came into the store, it was like the manager Tanisha, she let me in * * *.

"[Officer]: Ok.

"[Wilson]: Ya unnastan, but like * * * she went in front of me and I was behind her and I never turned around ta lock the door so it was like my job was done * * * from, from blank.

"[Officer]: Ok * * * Ok, that'll conclude the interview."

Wilson's statements tended to subject him to criminal liability, despite his attempts to minimize his involvement in the scheme. In his statements to the police, Wilson admitted that he, Workman and Julian concocted a plan to rob the store and that his job was to ensure their easy entrance. Wilson also admitted that he knew that Workman and Julian went to obtain guns for the robbery after they dropped him off at work. The overall incriminating nature of Wilson's statements to the police made the statements admissible pursuant to *Gilliam*. The trial court therefore did not err in admitting the taped statements of Julian's co-defendant against Julian in his trial.

We recognize that shortly before the *Gilliam* case was decided, the United States Supreme Court issued an opinion discussing the admissibility of co-defendants' statements.[5] In *Williamson,* the court indicated that whether an

---

5. *Williamson v. United States* (1994), 512 U.S. 594, 114 S.Ct. 2431, 129 L.Ed.2d 476.

out-of-court statement offered against the accused was admissible depended upon whether each individual statement came within a hearsay exception, not whether the entire statement or confession was, in general or as a whole, against the declarant's interest.

The co-defendant in *Williamson* had given a lengthy statement to the police that included not only information incriminating himself but also information inculpating the defendant. Referring to the underlying reasons for the hearsay rules and their exceptions, the court noted that the exception for statements against interest is based on the notion that "reasonable people, even reasonable people who are not especially honest, tend not to make self-inculpatory statements unless they believe them to be true." [6] This makes such statements more reliable than most hearsay.

However, an accused's statements to the police incriminating *others* and exculpating himself are not necessarily against the declarant's interest and therefore might not be reliable.[7] The Supreme Court recognized that an accused may make statements incriminating his cohorts to curry favor with the authorities or to shift the blame from himself to others. Thus, even in the context of a confession that, overall, exposed the declarant to criminal liability, the *Williamson* court held that only those particular statements that were against the declarant's interest fell within the hearsay exception.

The only decision by the Supreme Court of Ohio referring to *Williamson,* as of the date of release of this decision, is *State v. Tucker.*[8] In *Tucker,* the court emphasized that the *Williamson* decision was based on an interpretation of the federal evidentiary rules and did not implicate the defendant's constitutional right to confront the witnesses against him. The *Tucker* court ultimately held that it did not have to reach the applicability of *Williamson* or the admission of the co-defendant's statements since the overwhelming weight of the evidence independently supported Tucker's conviction.

Because the Supreme Court of Ohio in *Tucker* indicated that the rule set forth in *Williamson* was not of constitutional proportion and declined, although given the opportunity, to adopt *Williamson*'s reasoning, we continue to follow the plain language of *Gilliam.* Based on *Gilliam,* the statements were properly admitted at the trial and could have been considered by the jury in determining Julian's guilt.

---

6. *Williamson,* 512 U.S. at 599, 114 S.Ct. at 2435, 129 L.Ed.2d at 482.

7. *Id.*

8. *State v. Tucker* (1998), 81 Ohio St.3d 431, 692 N.E.2d 171.

For all of the foregoing reasons, we overrule Julian's first assignment of error.

IV.  Second and Third Assignments of Error:  Sufficiency of the Evidence

Julian's second assignment of error states that the trial court erred in overruling his Crim.R. 29 motion, made at the close of the state's case, and his third assignment claims that the verdict was not supported by sufficient evidence. Because the standards for reviewing the court's denial of a Crim.R. 29 motion and for reviewing the sufficiency of the evidence against a defendant are substantially the same, we consider these assignments of error together.

A motion pursuant to Crim.R. 29 should be granted only when reasonable minds cannot fail to find reasonable doubt of the defendant's guilt.[9]  To reverse a conviction for insufficient evidence, a reviewing court must be persuaded, after viewing the evidence in a light most favorable to the prosecution, that no rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt.[10]  Sufficiency is a test of adequacy.  Whether the evidence is legally sufficient to sustain a verdict is a question of law.[11]

Ample evidence was presented against Julian which, if believed by the jury, would have warranted a reasonable person in finding that all of the elements of the crimes with which Julian was accused were proven beyond a reasonable doubt.  Poellnitz provided a clear recitation of the events as they occurred on that day, and her testimony was corroborated by Rashid and Wilson. Although denying at trial that she could identify the robbers, she did admit that she told the police at the time of the robbery that she recognized the voice and teeth of one of the gunmen as those of Julian.[12]

Rashid's testimony of the events of the robbery was consistent with Poellnitz's. Rashid initially provided police with a signed, sworn statement that she had seen the robbers running away from the store and that, when they removed their masks, she recognized them as Julian and Workman.  Although she recanted her testimony at trial regarding the identity of the robbers, her prior statement, being a sworn statement, was appropriate substantive testimony for the jury to

---

**9.**  *State v. Apanovitch* (1987), 33 Ohio St.3d 19, 514 N.E.2d 394.

**10.**  *State v. Jenks* (1991), 61 Ohio St.3d 259, 574 N.E.2d 492, paragraph two of the syllabus.

**11.**  *State v. Thompkins* (1997), 78 Ohio St.3d 380, 386, 678 N.E.2d 541, 546.

**12.**  While Poellnitz's prior inconsistent statement could be used to impeach her trial testimony and attack her credibility, the prior statement itself was not substantive evidence and could not be considered as evidence of the crime itself.  See *Dayton v. Combs* (1993), 94 Ohio App.3d 291, 640 N.E.2d 863.

consider. It was within the jury's province to credit the statement that Rashid gave shortly after the robbery rather than her repudiation on the stand at trial.

Wilson's statements provided critical evidence establishing the plan that he, Workman and Julian decided upon for the robbery, and his statements about the implementation of that plan were consistent with the descriptions given by Rashid and Poellnitz about that morning's events. Poellnitz's and Rashid's eyewitness testimony, Rashid's sworn statement identifying Julian as one of the robbers, and Wilson's confirmation of the planned robbery and Julian's role in the plan provided sufficient evidence to warrant a conclusion that Julian's guilt was proven beyond a reasonable doubt. Julian's second assignment of error is overruled.

### V. Conclusion

We overrule all of Julian's assignments of error and affirm the judgment of the trial court.

*Judgment affirmed.*

SUNDERMANN, P.J., concurs.

PAINTER, J., concurs separately.

PAINTER, Judge, concurring.

I concur in the judgment. While I believe that *Gilliam* is no longer good law after *Williamson*, in spite of the fact that the Ohio Supreme Court simply ducked the issue in *Tucker*, it seems to me that the statement here was sufficiently against penal interest to be admissible in any event.