OPINION
Laterell L. Turner[1] appeals from a judgment of the Montgomery County Court of Common Pleas which found him guilty upon no contest pleas of carrying a concealed weapon and possession of crack cocaine in an amount between ten and twenty-five grams. The evidence presented at the hearing on the motion to suppress was undisputed and established the following version of events.
On June 3, 1998, the West Carrollton police department received a call from a gas station attendant at a Sunoco station located at the intersection of east Dixie Drive and State Route 741. The attendant alerted the police that Turner, who was trying to purchase a money order at the station, had attempted to pass three counterfeit twenty dollar bills. Officer Brian Brodbeck was dispatched to the scene.
Brodbeck initially questioned Turner inside the gas station to obtain Turner's version of the events. Turner reported that he had received the counterfeit money from a friend as payment for rent. Brodbeck then asked Turner to sit in his cruiser and told him that he was not under arrest, but was being detained so that Brodbeck could further investigate the situation.
After "tell[ing] him numerous times that he was not under arrest," Brodbeck asked Turner if he could search his car. Turner replied, "No, I won't let you do that, because I don't know why you need to search my car."
After consulting with his supervisor, Brodbeck transported Turner to the West Carrollton police station, telling him that he was being detained for further investigation. At the police station, Detective Mark Allison approached Turner in the "road room," a room where officers routinely sat to make their reports. Allison introduced himself to Turner and told him that he was not under arrest and that he was not required to answer any questions. Allison then explained that he wanted to search Turner's car because of the complaint that he had passed counterfeit twenty dollar bills. Allison told him that he had "been doing this a long time, and [that there was] nothing in his car that [he had not] found in a car before." Allison informed Turner that he wanted to show him a consent to search form, and that if Turner did not want to consent, he would try to get a search warrant, but that there was no guarantee that a judge would approve one. Turner then "blurted out" the following: "I've got a nine in the car, and I didn't want to be arrested for CCW." Allison understood Turner's statement to refer to a nine millimeter gun.
Allison took Turner to his office. He got out a pre-interview form listing the Miranda rights, read it to Turner, and showed it to him. Turner initialed each right listed on the form to indicate that he understood the rights. Allison read and showed Turner a waiver of rights form and Turner signed it. Allison testified that during this process, Turner never stopped the interview and did not ask for a lawyer. Allison further stated that he did not promise Turner anything or threaten him.
Allison reviewed a consent to search form with Turner, reading and showing it to him, and filled it out. Turner signed the consent to search form to allow the police to search his car and told Allison that the gun was in the glove box.
Allison, Turner, and two other officers went back to the Sunoco station. Turner unlocked his car and one of the officers retrieved the unloaded gun and one or two magazines from the glove box. The officers also searched the remainder of the car, but found nothing. While they were at the Sunoco station, Secret Service Agent Kevin Bereda arrived at the scene. Bereda had been called by another West Carrollton police officer to investigate the counterfeit money.
Turner was taken back to the police station. Bereda reviewed Turner's Miranda rights with him and began to interview him. Turner told Bereda that he had received the money from a friend as payment for rent. Bereda told Turner, "I don't buy that," and continued to interview Turner. Eventually, Turner admitted that he had over two hundred dollars of counterfeit money at his apartment. Bereda went over a consent to search form with Turner and Turner signed it to allow the police to search his apartment.
Turner, Bereda, Allison, and another officer went to Turner's apartment. As the search began, Allison asked Turner, "Are we gonna [sic] find anything around here that we shouldn't, any drugs or cocaine or marijuana, anything * * * that you're not supposed to have?" Turner replied, "No."
While searching a top dresser drawer in the master bedroom, Allison found a metal container that "looked [like] an ideal place to store some money." Allison opened the container and found a baggie of crack cocaine. As Allison found the baggie, Turner stomped his foot and said, "Shit, * * * I forgot about that" and told Allison that he "kept that around for the ladies."
Turner was taken back to the police station, where he made a written statement expressing that he had received the counterfeit money from a man named "Mike" to whom he had sold a nine millimeter handgun, and that he had planned to use the crack cocaine "for recreational purposes[, t]o include obtaining sexual favors[.]" Turner was arrested and charged with carrying a concealed weapon in violation of R.C. 2923.12(A) and possessing crack cocaine in an amount between ten and twenty-five grams in violation of R.C. 2925.11(A).
On March 5, 1999, Turner filed two motions to suppress. In his first motion, he argued that his statements were the fruits of an illegal arrest, were involuntary, and were made without an effective waiver of his constitutional rights. In his second motion, he argued that the searches were not authorized by warrant, were the fruits of an illegal arrest, and were conducted in violation of his constitutional rights. A suppression hearing began on March 10, 1999 and concluded on March 18, 1999. The trial court overruled Turner's motion on March 25, 1999.
Turner pled no contest to both charges. The trial court found him guilty and sentenced him to six months incarceration and a $5,000.00 fine for carrying a concealed weapon and to a mandatory two years incarceration and a $7,500.00 fine for possessing crack cocaine. The sentences were to be served concurrently and the fine for count one was suspended. Turner now appeals the denial of his motion to suppress.
Turner advances two assignments of error on appeal. Because the issues raised in these assignments of error are interrelated, we will address them together.
 I. THE COURT ERRED IN FAILING TO SUPPRESS EVIDENCE, BASED UPON ITS ERRONEOUS FINDING THAT DEFENDANT'S DISCLOSURE THAT THERE WAS A GUN IN HIS CAR WAS ADMISSIBLE EVIDENCE.
 II. THE COURT ERRED IN FAILING TO SUPPRESS EVIDENCE BASED UPON ITS ERRONEOUS FINDING THAT DEFENDANT'S ADMISSIONS WERE VOLUNTARILY OBTAINED.
Turner's arguments are three-fold. First, he argues that because he was not given Miranda warnings before he made the statement regarding the handgun in his vehicle, the statement should have been suppressed. Second, he argues that his waiver of his Miranda rights was not voluntary. Third, he argues that his consents to the searches of his car and apartment were not voluntary.
"The duty to advise a suspect of Miranda rights does not attach until questioning rises to the level of a `custodial interrogation.'" State v. Gumm (1995), 73 Ohio St.3d 413, 329,653 N.E.2d 253, 268, certiorari denied (1996), 516 U.S. 1177,116 S.Ct. 1275 (citation omitted); Miranda v. Arizona (1966),384 U.S. 436, 444, 86 S.Ct. 1602, 1612. Thus, Turner must have been in police custody and subjected to police interrogation before the officers were required to give him Miranda warnings.
Turner argues that he was in custody and that he was being interrogated at the time he made the statement regarding the handgun because "a request for consent to search a vehicle qualifie[s] as interrogation." In denying his motion to suppress, the trial court concluded that Turner was in police custody at the time he made the statement regarding the handgun, but that he was not being interrogated, and thus Miranda warnings had not been required.
In Rhode Island v. Innis (1980), 446 U.S. 291,100 S.Ct. 1682, the Supreme Court "refine[d] the contours of the term `interrogation.'" State v. Tucker (1998), 81 Ohio St.3d 431, 435,692 N.E.2d 171, 175. The Innis Court "emphasized [that] theMiranda rules do not operate to prevent the use as evidence ofevery statement made by a person in custody: `* * * Any statement given freely and voluntarily without any compelling influences is * * * admissible in evidence.'" Tucker, 81 Ohio St.3d at 436,692 N.E.2d at 175, quoting Innis, 446 U.S. at 299-300,100 S.Ct. at 1689. Further, "`[i]nterrogation,' as conceptualized in theMiranda opinion, must reflect a measure of compulsion above and beyond that inherent in custody itself." Innis, 446 U.S. at 300,100 S.Ct. at 1689.
To determine whether a suspect has been "interrogated," the focus must be on whether the suspect was compelled to speak because of police coercion. Id. at 300-301,100 S.Ct. at 1689-1690. The Court stated that such compulsion could be brought on by either express questioning by the police officers or the functional equivalent of express questioning, which it defined as "any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." Id. at 300, 100 S.Ct. at 1689-1690. See, also, Tucker, 81 Ohio St.3d at 435-437, 692 N.E.2d at 175-176;State v. Knuckles (1992), 65 Ohio St.3d 494, 605 N.E.2d 54, paragraph two of the syllabus, certiorari denied (1993),508 U.S. 981, 113 S.Ct. 2986; State v. Williams (1983), 6 Ohio St.3d 281,452 N.E.2d 1323, paragraph five of the syllabus, certiorari denied (1983), 464 U.S. 1020, 104 S.Ct. 554.
The record does not reveal any evidence of express questioning or the functional equivalent by Allison because none of his words or actions were meant to elicit information from Turner regarding the incidents at the Sunoco station. Allison testified that before he approached Turner, there was a discussion between Brodbeck and Sergeant Wilson about obtaining a search warrant, and that during this discussion, he began writing down some information to apply for a search warrant. He testified that he then stated, "Let me go back and I'll talk to the guy for a couple of minutes, see what's going on with it." Allison introduced himself to Turner, told him that he was not under arrest, and told him that he did not have to speak if he did not wish to do so. He told Turner that he wanted to look in his car because of the complaint that he had passed three counterfeit twenty dollar bills and asked Turner if he could "go over a consent to search form" with him. Allison explained that if Turner did not consent, he would attempt to get a search warrant, but that there was no guarantee that a judge would approve one. At that point, Turner "blurted out" his statement. It is clear from the record that Allison approached Turner with the goal of obtaining Turner's consent to search. He was not attempting to elicit incriminating statements from Turner; the only question he asked him was whether he would be willing to review a consent to search form. On cross examination, Allison agreed that he had hoped Turner would respond to him and admitted that he had ultimately wanted to engage Turner in a conversation about the contents of the car. Allison stated, however, "If I was gonna [sic] question him or talk to him any further [after asking him to review the consent form], * * * I would have read him his rights." Thus, Allison did not expressly question Turner about the alleged crime and he had no reason to think that his question about reviewing the consent form was likely to elicit an incriminating response from Turner. Based upon the evidence, we cannot conclude that the trial court erred in determining that Turner was not undergoing interrogation, as is required before Miranda warnings must be given, at the time he made the statement.
We also note that "a suspect who has once responded to unwarned yet uncoercive questioning is not thereby disabled from waiving his rights and confessing after he has been given the requisite Miranda warnings." Oregon v. Elstad (1985),470 U.S. 298, 318, 105 S.Ct. 1285, 1298. Thus, even if the unwarned statement regarding the handgun was suppressed, Turner's voluntary statements made after he was properly warned would be admissible.
Turner further argues that his waiver of his Miranda rights was not voluntary. He claims that his "background and inexperience with the legal system left him vulnerable to police coerciveness."
To determine the validity of a suspect's waiver of hisMiranda rights, a court must look at the totality of the circumstances. Gumm, 73 Ohio St.3d at 429, 653 N.E.2d at 268;State v. Smith (1991), 61 Ohio St.3d 284, 288, 574 N.E.2d 510,515, certiorari denied (1992), 502 U.S. 1110, 112 S.Ct. 1211. Upon review of the record, we find no evidence that Turner was inexperienced with the legal system. Further, there is no evidence of police coercion. Allison testified that he showed Turner the form listing his Miranda rights, and read it to him, and that Turner initialed each right indicating that he understood it. Allison did the same with the waiver form and Turner signed it. During this process, Turner never attempted to stop the discussion and did not ask for a lawyer. Allison testified that he did not threaten Turner or promise him any favors for signing the waiver. Evidence in the record reveals that Turner had completed thirteen years of schooling. Based upon the totality of the circumstances, we cannot conclude that the trial court erred in finding that Turner voluntarily waived his Miranda rights.
Turner argues that his consents to the searches of his car and apartment were not voluntary.
The Fourth Amendment bars unreasonable searches and seizures.Maryland v. Buie (1990), 494 U.S. 325, 331, 110 S.Ct. 1093, 1096
(citation omitted). Warrantless searches are per se unreasonable unless they fall within a carefully defined group of exceptions.Katz v. U.S. (1967), 389 U.S. 347, 357, 88 S.Ct. 507, 514. One of these exceptions is consent. Schneckloth v. Bustamonte (1973),412 U.S. 218, 219, 93 S.Ct. 2041, 2043-2044. To be valid, the consent must be "in fact voluntarily given, and not the result of duress or coercion, express or implied." Id. at 248,93 S.Ct. at 2059.
Turner consented to two different searches. Before Turner consented to the search of his vehicle, Allison reviewed a consent to search form with him by reading it and showing it to him. Turner then signed it. Bereda similarly reviewed a consent to search form with Turner before he consented to the search of his apartment. Allison testified that he never threatened Turner. In fact, he stated that during his interaction with Turner, Turner was "very open to conversation, * * * pretty friendly, smiled[, and] * * * was very cooperative the entire time." Turner never asked to leave or to stop the discussion. Based upon the record, we cannot find that the trial court erred in concluding that Turner was not subjected to police coercion or duress when he gave his consents to the searches.
The first and second assignments of error are overruled.
The judgment of the trial court will be affirmed.
FAIN, J. and YOUNG, J., concur.
[1] The trial court record refers to the defendant as "Laterel L. Turner" and "Laterell L. Turner." When signing documents, the defendant spells his first name "Laterell" and thus we have captioned our opinion as such.