The STATE of Ohio, Appellee,

v.

CAUSEY, Appellant.

[Cite as *State v. Causey* (2001), 144 Ohio App.3d 709.]

Court of Appeals of Ohio,
First District, Hamilton County.

No. C–980935.

Decided June 29, 2001.

*Michael K. Allen,* Hamilton County Prosecuting Attorney, and *Thomas J. Boychan, Jr.,* Assistant Prosecuting Attorney, for appellee.

*Hastings & Hastings* and *Robert Hastings, Jr.*, for appellant.

SUNDERMANN, Judge.

Following a jury trial, defendant-appellant Dale Causey was found guilty of aggravated murder with a firearm specification, in violation of R.C. 2903.01, and aggravated robbery with a firearm specification, in contravention of R.C. 2911.01. Causey was sentenced as appears of record. In his appeal, Causey raises three assignments of error.

We start with Causey's second and third assignments of error. In those assignments, Causey challenges the weight and sufficiency of the evidence. To reverse on sufficiency, we must review the record in the light most favorable to the prosecution and be convinced that a rational trier of fact could not have concluded that the elements of the crimes had been established beyond a reasonable doubt.[1] To reverse on the manifest weight of the evidence, we must review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of the witnesses, and conclude that, in resolving conflicts in the evidence, the trier of fact clearly lost its way and created a manifest miscarriage of justice.[2]

According to Michael Lester, Anthony Scott had agreed to purchase a kilogram of cocaine from Causey for $21,000 on September 20, 1989. Because Causey tried to sell counterfeit cocaine, the transaction was not completed on that date. In an apparent attempt to give Causey one more chance to make good on the sale, Scott and Lester agreed to meet Causey the next evening. On September 21, 1989, sometime in the early evening, Scott got into Causey's car with $21,000 in cash (mostly in twenty-dollar bills) to make the purchase. Lester waited for Scott to return, but he never did.

According to two eyewitnesses, a brown Datsun, later identified as Causey's car, was driven into an apartment complex on the evening of September 21. Both witnesses heard fighting followed by multiple gunshots coming from the car. One witness testified that two men had been fighting about money. After hearing the gunshots, both witnesses observed the driver get out of the car and pull the passenger onto the ground. The passenger was later identified as Anthony Scott. Of the $21,000, the police recovered only $500 from Scott's wallet and three twenty-dollar bills covered in blood near Scott's body. The coroner

---

1.  See *State v. Thompkins* (1997), 78 Ohio St.3d 380, 386, 678 N.E.2d 541, 546; *State v. Jenks* (1991), 61 Ohio St.3d 259, 574 N.E.2d 492, paragraph two of the syllabus.

2.  See *State v. Thompkins, supra,* at 387, 678 N.E.2d at 546–547.

testified that Scott had died within a few minutes of being shot in the chest at "close range." A brown Datsun was found several days after Scott's murder. The interior of the car was covered in blood from Scott's blood type, and Causey's fingerprint was found near the sunroof. Given the testimony of Lester, the eyewitnesses, the coroner, and the police investigators, we are convinced that sufficient evidence was presented to support convictions for aggravated murder and aggravated robbery.

Moreover, we are convinced that the trial court properly weighed the evidence. Despite testimony that a woman retrieved money from Scott's wallet after he had been shot, the jury apparently found the testimony of Lester and the police officers to be more credible. Because the weight to be given the evidence and the credibility of the witnesses were primarily for the trier of fact,[3] we cannot say that, as a matter of law, the jury improperly weighed the evidence. The evidence presented at trial overwhelmingly supported Causey's convictions. Under these circumstances, we are not persuaded that the jury lost its way by finding Causey guilty of aggravated murder and aggravated robbery. Accordingly, we overrule the second and third assignments of error.

In the first assignment of error, Causey challenges the denial of his motion to suppress the statement he made right after he was arrested. The trial court relied on the testimony of special agent Harry Boyd to make its ruling. Boyd testified that he had obtained a warrant to arrest Causey. According to Boyd, Causey initially provided false information about his identity. After ascertaining Causey's true identity and placing him in handcuffs, Boyd told Causey, "I arrested your son." Causey's response was, "You've got me arrested but the case isn't to court yet and you have no witnesses."

Causey argues that this statement was obtained in violation of his Fifth Amendment right to remain silent pursuant to *Miranda v. Arizona*,[4] since it was in response to a question posed to him while he was in custody but before he had been read his rights. The state argues that Causey voluntarily and knowingly waived his *Miranda* rights, and that, if there was any error, it did not rise to the level of plain error.

■■■ *Miranda* mandates that all individuals who are taken into official custody must be advised of certain constitutional rights. Those rights may

---

3.  See *State v. DeHass* (1967), 10 Ohio St.2d 230, 39 O.O.2d 366, 227 N.E.2d 212, paragraph one of the syllabus.

4.  (1966), 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694.

voluntarily be waived, provided that the waiver is intelligent, knowing, and voluntary, and occurs before the suspect is interrogated.[5] This ensures that any statement made by a suspect is voluntary and not coerced. Although a suspect must be advised of certain rights before statements made during a custodial interrogation will be admissible, the duty to advise a suspect of the *Miranda* rights does not arise until there is a "custodial interrogation."[6]

In this case, it is undisputed that Causey was in custody, having been arrested on a warrant,[7] and that he was not given his *Miranda* warnings. But Causey must have been subjected to police interrogation before the officers were required to give him *Miranda* warnings. To determine whether Causey was "interrogated," our focus is on whether he was compelled to speak by police coercion.[8] Compulsion may be brought about by express questioning, or by any words or actions on the part of the police that the police know or should know are "reasonably likely to elicit an incriminating response * * *."[9]

The testimony presented at the suppression hearing and at trial supports the state's contention that Causey's statement was not a result of police coercion. The first part of Agent Boyd's questioning involved only routine booking matters, as Boyd was attempting to accurately identify Causey. Routine booking questions do not constitute custodial interrogation.[10] As for the remainder of the exchange, Boyd's testimony indicates that no measure of compulsion was involved. Boyd testified that he did not expect a response to his comment about Causey's being under arrest. Moreover, Boyd should not have reasonably anticipated that his comment would elicit an incriminating response. Finally, Causey's response was not clearly incriminating, as it was ambiguous and, therefore, not prejudicial. In sum, Causey's statement was not coerced, and *Miranda* warnings were not necessary. Given that, we conclude that the trial

---

5. See *id.* at 444, 86 S.Ct. at 1612, 16 L.Ed.2d at 706–707.

6. See *State v. Mason* (1998), 82 Ohio St.3d 144, 153, 694 N.E.2d 932, 946, citing *Berkemer v. McCarty* (1984), 468 U.S. 420, 104 S.Ct. 3138, 82 L.Ed.2d 317.

7. See *State v. Maurer* (1984), 15 Ohio St.3d 239, 256, 15 OBR 379, 393–394, 473 N.E.2d 768, 785.

8. See *State v. Tucker* (1998), 81 Ohio St.3d 431, 436, 692 N.E.2d 171, 175.

9. *Rhode Island v. Innis* (1980), 446 U.S. 291, 301, 100 S.Ct. 1682, 1689–1690, 64 L.Ed.2d 297. See, also, *State v. Tucker, supra.*

10. See *Pennsylvania v. Muniz* (1990), 496 U.S. 582, 600–601, 110 S.Ct. 2638, 2650, 110 L.Ed.2d 528.

court properly overruled Causey's motion to suppress, and we overrule the first assignment of error.

The judgment of the trial court is affirmed.

*Judgment affirmed.*

SHANNON, J., concurs.

GORMAN, P.J., dissents.

RAYMOND E. SHANNON, J., retired, of the First Appellate District, sitting by assignment.

GORMAN, Presiding Judge, dissenting.

I respectfully dissent. The majority concedes that Causey was not given his *Miranda* rights but was in custody when he said to Agent Boyd, "You've got me arrested but the case isn't to court yet and you have no witnesses." The majority errs when it determines that this statement was neither prompted by interrogation nor inculpatory in nature.

Agent Boyd admitted that he knew Causey's identity while he questioned him. His repeated questioning, therefore, was not simply to elicit responses for routine booking purposes, as the majority holds, but to try to break down Causey psychologically until he answered truthfully. As Boyd stated in his deposition:

"*I continued to ask him until I was satisfied that he was giving me the right information.* As you mentioned, he had given me bogus information repeatedly that day. I continued to ask him background information about himself *until he convinced me that he was telling the truth,* when he gave me his true name, his true date of birth, and finally figured out which was his true Social Security number. In the process of asking those questions I told him, 'By the way, did you know that I arrested his—I arrested your son?' And he was, I think, a little taken aback about that, and at that point he volunteered further information. * * * I told him, 'I arrested your son,' because I thought it would be an interesting thing to say to a man I just arrested for murder. * * * *I thought he would find it ironic.*" (Emphasis added.)

The highlighted portions make clear that Boyd was engaged in a process of interrogation, not routine questioning. The mention of his arrest of Causey's son—because Boyd thought Causey would find it "ironic"—is certainly not the type of statement made by police officers "normally attendant to arrest and custody." *Rhode Island v. Innis* (1980), 446 U.S. 291, 301, 100 S.Ct. 1682, 1689–1690, 64 L.Ed.2d 297, 308. The majority concedes this point by recognizing that Boyd's statement deviated from the other questions he asked.

I disagree, further, with the majority's statement that Causey's questioning, under the circumstances, did not involve a measure of compulsion. What greater measure of compulsion would there be than Causey's being hauled out of a residence by an FBI SWAT team and police officers, ordered to lie on the ground, handcuffed, and questioned without receiving *Miranda* warnings? The situation is not remotely comparable to *State v. Tucker* (1998), 81 Ohio St.3d 431, 692 N.E.2d 171, relied on by the trial court, where a defendant made incriminating statements to a corrections officer in a county jail.

As an FBI agent with twenty-nine years of service, Agent Boyd presumably knew that what he said was reasonably likely to induce an incriminating response from Causey. See *State v. Knuckles* (1992), 65 Ohio St.3d 494, 605 N.E.2d 54, paragraph two of the syllabus; *State v. Tucker* at 436, 692 N.E.2d at 175. His testimony was palpable evidence that he was tweaking Causey, trying to goad him into further dialogue. The technique was "interrogation" by any definition. The statement about Causey's son was not only likely to prompt an incriminating response from Causey, but intended for that purpose.

Finally, I disagree with the majority's conclusion that Causey's response to Agent Boyd was ambiguous and not prejudicial. Causey's response was certainly not a denial of the crimes. Short of a complete confession, what can be more incriminating than a suspect's defiant statement to the arresting officer that the police cannot produce witnesses to prove his guilt?

The United States Supreme Court recently held, "*Miranda* has become embedded in routine police practice to the point where the warnings have become part of our national culture." *Dickerson v. United States* (2000), 530 U.S. 428, 443, 120 S.Ct. 2326, 2336, 147 L.Ed.2d 405, 419. In my opinion, the majority's decision ignores the very purpose of *Miranda* warnings, which might always be given before any custodial interrogation takes place. The consequence of not adhering to this requirement allows, as it does in this case, the government to rely upon the inherently coercive nature of police custody and the techniques of interrogation to extract incriminating statements from suspects unadvised of their right to remain silent.