[This opinion has been published in *Ohio Official Reports* at 81 Ohio St.3d 431.]

THE STATE OF OHIO, APPELLANT, *v.* TUCKER, APPELLEE.

[Cite as *State v. Tucker*, 1998-Ohio-438.]

*Criminal law—Evidence—Miranda warnings not given—Statement made by defendant in county jail implicating himself in murder not the product of an interrogation by corrections officers, when—Motion to suppress properly denied by trial court, when—Admission of co-defendant's taped statements harmless error, when.*

(No. 96-1627—Submitted December 3, 1997—Decided April 22, 1998.)

APPEAL from the Court of Appeals for Shelby County, No. 17-95-10.

———————————

{¶ 1} Defendant-appellee, Louis Allen Tucker, was tried before a jury in the Court of Common Pleas of Shelby County on charges of aggravated murder, in violation of R.C. 2903.01, with a death penalty specification, and of aggravated robbery, in violation of R.C. 2911.01. Tucker also faced gun specification charges related to the murder and robbery charges.

{¶ 2} The following facts were adduced at trial:

{¶ 3} On March 9, 1994, the body of Thomas Herring was found in his home. Herring's death resulted from two gunshot wounds, either of which would independently have caused his death. One of the wounds was a gunshot wound to the victim's upper chest; this wound came from a shot fired by a handgun. The other wound was to the victim's face; it was determined to have been caused by a shotgun blast.

{¶ 4} Shawn Burnham, an acquaintance of Tucker, related an eyewitness account at Tucker's trial of events that transpired on March 9, 1994.

{¶ 5} Early in the morning of that day, at about 5:00 a.m., Burnham received a phone call from his friend, Daniel Brock, asking Burnham to drive to Brock's

residence. Burnham was to transport Brock to an unspecified location, where Brock wanted to obtain some guns. Burnham soon arrived at Brock's house, and picked up Brock and Tucker, who was also there. They went to Tucker's brother's house, where the three got a gun to take with them.

{¶ 6} They proceeded to Herring's house, in rural Shelby County. Brock and Tucker entered the house with Herring, while Burnham waited in his car. Eventually, Herring, Brock, and Tucker went outside in back of the house with some guns, and engaged in target shooting. The three reentered the house, with Burnham still waiting in his car. Brock came outside to tell Burnham to wait, since they would be a bit longer, and then Brock reentered the house.

{¶ 7} Burnham, tired of waiting, went up to the house, knocked on the door, and entered the kitchen of the house after Brock opened the door. When Burnham went into the house, Brock had taken a seat at the kitchen table. Tucker was standing across from Brock, holding a pistol. Herring was also seated at the table. Burnham told Brock he was ready to leave, and Brock showed Burnham a gun, saying he was going to buy it.

{¶ 8} Burnham then heard a bang, looked over at Tucker, and realized that Tucker had shot Herring with the pistol. Immediately after that, Brock stood up with a shotgun that had been on the table, and also shot Herring, in the face, at close range. Herring fell to the floor, and Burnham ran from the house to his car.

{¶ 9} Burnham started his car, but before he could leave, Brock came out of the house carrying the shotgun and came up to Burnham's car. Brock told Burnham that he would kill him if he left. Burnham then waited in the car while Tucker and Brock brought some guns out and put them into the car. The three left and went to the home of Tucker's brother. Tucker carried the guns into the house, and remained there. Burnham took Brock home, and then went home himself.

{¶ 10} Shanda Grieves testified at Tucker's trial that she received a phone call from Brock around the date of Herring's murder asking her to take Tucker and

2

Brock that day to southern Kentucky in her car. Prior to their departure, Brock and Tucker borrowed her car for a time. Then she took them to Kentucky, where Tucker and Brock retrieved guns from her car and took them into a house. Tucker remained in Kentucky with relatives while Grieves and Brock returned to Ohio. Tucker later was arrested in Kentucky, and returned to Ohio by authorities.

{¶ 11} While awaiting trial, Tucker was held in the Logan County Jail. On December 4, 1994, Tucker made a statement to Logan County corrections officers implicating himself in the murder of Thomas Herring, and admitted to taking the guns.

{¶ 12} Prior to the start of Tucker's trial, the trial court, after holding a hearing, denied Tucker's motion to suppress the statement made by Tucker to the Logan County corrections officers.

{¶ 13} At Tucker's trial, the state presented evidence, including the testimony of Shawn Burnham, Shanda Grieves, and other witnesses, regarding Tucker's participation in the killing and taking of the guns. The state also presented the testimony of Deputy Sheriff Larry Garwood, a Logan County corrections officer, who recited to the jury the statement Tucker had made while in the Logan County Jail admitting his guilt. In addition, after Brock took the stand outside the presence of the jury and invoked his Fifth Amendment privilege against self-incrimination, the state played for the jury, over Tucker's objection, a taped question and answer session between Brock and Shelby County deputies made on March 31, 1994, after Brock's apprehension. This tape contained statements made by Brock about the killing and taking of the guns.

{¶ 14} After the state rested its case, Tucker presented no witnesses on his behalf, and the case went to the jury, which found Tucker guilty of all charges against him. The jury declined to recommend death after returning to consider the imposition of the death penalty, and the trial court sentenced Tucker to life

imprisonment with parole eligibility after thirty years on the aggravated murder count and to terms of imprisonment on the other counts.

{¶ 15} The court of appeals, in a split decision, reversed the convictions and sentence and remanded for a new trial. That court found that the trial court should have suppressed Tucker's statement made in the Logan County Jail because Tucker was subjected to the "functional equivalent of custodial interrogation" without being given *Miranda* warnings. Furthermore, the court of appeals found that the trial court erred in allowing Brock's taped statements to be played for the jury as evidence against Tucker.

{¶ 16} The dissenter at the court of appeals would have found that Tucker was not subject to impermissible interrogation, so that the trial court did not err in denying Tucker's motion to suppress. In addition, the dissenter would have found the admission of both Tucker's statement and Brock's taped statements to be harmless error, believing that there was overwhelming evidence introduced at trial that Tucker was guilty of aggravated murder and aggravated robbery even without considering those statements.

{¶ 17} The cause is now before this court pursuant to the allowance of a discretionary appeal.

_____

*James F. Stevenson,* Shelby County Prosecuting Attorney, and *Michael F. Boller,* Assistant Prosecuting Attorney, for appellant.

*Elsass, Wallace, Evans, Schnelle & Co., L.P.A.,* and *Thomas A. Ballato,* for appellee.

_____

**ALICE ROBIE RESNICK, J.**

{¶ 18} This case requires us to resolve two issues. The first is whether Tucker was subjected to an "interrogation" by the corrections officers without being given the requisite *Miranda* warnings. The second issue is whether admission of

Brock's taped statements was prejudicial error. For the reasons which follow, we determine that neither of the trial court's separate decisions to allow Tucker's statement and Brock's statements into evidence was prejudicial error requiring a reversal of Tucker's convictions. We reverse the judgment of the court of appeals and reinstate Tucker's convictions.

I

{¶ 19} After his apprehension in Kentucky, Tucker was brought to the Logan County Jail on April 12, 1994, and held there while awaiting trial. Tucker was in a "day room" with several other inmates at the jail on December 4, 1994, when corrections officers guarding him noticed that he was nervous and "wasn't himself." Tucker had been watching television news coverage of Brock's separate trial.

{¶ 20} The guards, Logan County Deputy Sheriff Larry Garwood and Jail Corporal Phil Bailey, also with the Logan County Sheriff's Department, decided to remove Tucker from the day room and to take him to another room in the jail, away from other prisoners. The guards gave him a cigarette and a soft drink, in an effort to calm him down. Tucker had undergone some mental health counseling while being detained, and the guards asked him if he wanted them to contact a mental health professional to come to the jail. Tucker told them that he did not want a counselor. Tucker began talking about Brock's trial to the guards, telling them he wished "this would just get over" so he could "start [his] time." He had in the past told the guards that it helped him to talk about it and to get it off his chest because it helped him sleep. Tucker told the guards he was going to plead guilty when he was tried (unless Brock got the death penalty, because he wouldn't plead guilty then). At this point, one of the guards remarked, "when this is all said and done, I'd like to hear about what happened that day." Tucker stated that he would tell them "right now" what happened "if it doesn't go any further." One of the guards said, "you don't have to talk about it." Tucker said it helped him to talk about it,

and proceeded to tell the guards of the plan he and Brock came up with to rob Thomas Herring's house of the guns, describing the shootings of Herring in the kitchen and the taking of Herring's guns.

{¶ 21} At the hearing held on Tucker's motion to suppress, both Deputy Garwood and Corporal Bailey testified to the circumstances surrounding Tucker's statement to them at the Logan County Jail, as well as to the details of the statement itself. After the trial court denied the motion to suppress the state's use of this statement, Deputy Garwood also testified at Tucker's trial, over renewed defense objections, about the statement's factual setting and its contents.

{¶ 22} At issue is whether Tucker's motion to suppress the statement should have been granted by the trial court because he was subjected to an "interrogation" without being given *Miranda* warnings at the time, so that the statement should not have been used against him at his trial. We must therefore consider what "interrogation" means in this context.

{¶ 23} In the course of its opinion in *Miranda v. Arizona* (1966), 384 U.S. 436, 444, 86 S.Ct. 1602, 1612, 16 L.Ed.2d 694, 706, the United States Supreme Court, in establishing the well-known "*Miranda* rules" for advising suspects of their rights, stated that "[b]y custodial interrogation, we mean questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." In *Rhode Island v. Innis* (1980), 446 U.S. 291, 298, 100 S.Ct. 1682, 1688, 64 L.Ed.2d 297, 306, the court undertook to refine the contours of the term "interrogation" in light of the use of the word "questioning" in *Miranda*.

{¶ 24} The *Innis* court determined that the *Miranda* rules are not so narrow as to apply to only "those police interrogation practices that involve express questioning of a defendant * * *." *Innis,* 446 U.S. at 298, 100 S.Ct. at 1688, 64 L.Ed.2d at 306. The *Innis* court read the term "interrogation" more broadly, to also include the more subtle "techniques of persuasion" sometimes employed by police

officers that do not rise to the level of express questioning, but which also can be extremely coercive in some situations. *Id.,* 446 U.S. at 299-300, 100 S.Ct. at 1689, 64 L.Ed.2d at 306-307.

**{¶ 25}** However, as the *Innis* court emphasized, the *Miranda* rules do not operate to prevent the use as evidence of *every* statement made by a person in custody: " 'Confessions remain a proper force in law enforcement. Any statement given freely and voluntarily without any compelling influences is, of course, admissible in evidence. *The fundamental import of the privilege* [against compulsory self-incrimination] *while an individual is in custody is not whether he is allowed to talk to the police without the benefit of warnings and counsel, but whether he can be interrogated.*' " (Emphasis *sic*.) *Id.*, 446 U.S. at 299-300, 100 S.Ct. at 1689, 64 L.Ed.2d at 307, quoting *Miranda*, 384 U.S. at 478, 86 S.Ct. at 1630, 16 L.Ed.2d at 726. Moreover, the *Innis* court determined that " '[i]nterrogation,' as conceptualized in the *Miranda* opinion, must reflect a measure of compulsion above and beyond that inherent in custody itself." 446 U.S. at 300, 100 S.Ct. at 1689, 64 L.Ed.2d at 307.

**{¶ 26}** Thus, to determine whether a suspect has been "interrogated," the heart of the inquiry focuses on police coercion, and whether the suspect has been compelled to speak by that coercion. This compulsion can be brought about by express questioning, but also can be brought about by the "functional equivalent" of express questioning, *i.e.,* "any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." (Footnotes omitted.) *Id.*, 446 U.S. at 300-301, 100 S.Ct. at 1689-1690, 64 L.Ed.2d at 308. See, also, *State v. Williams* (1983), 6 Ohio St.3d 281, 6 OBR 345, 452 N.E.2d 1323, paragraph five of the syllabus ("For purposes of application of the *Miranda* rule, custodial interrogation refers not merely to explicit questioning but also to any words or actions on the part of police officers, excepting those normally

incident to arrest and custody, that the officers should know are reasonably likely to induce an incriminating response from the suspect."); *State v. Knuckles* (1992), 65 Ohio St.3d 494, 605 N.E.2d 54, paragraph two of the syllabus ("When a statement, question or remark by a police officer is reasonably likely to elicit an incriminating response from a suspect, it is an interrogation.").

{¶ 27} Initially, there is no evidence in the record of any *actual* coercive practices employed by the corrections officers. It is clear that no actual express questioning, in the sense of the first prong of *Miranda* regarding "interrogation," occurred in this case. Furthermore, the officers cannot be said to have designed their words or actions in an attempt to elicit an incriminating response from Tucker, so that it is apparent that the officers did not invite, nor did they expect, a response. The testimony of the corrections officers regarding the making of Tucker's statement reveals that no questions meant to elicit information from Tucker about the incidents at the Herring home were voiced. However, pursuant to *Innis*, the inquiry does not stop there. In this context, what the officers should have known as to the reasonable impact their statements would have had on Tucker is just as important.

{¶ 28} Our inquiry thus focuses on the second, "functional equivalent," interrogation prong of *Miranda*, as discussed in *Innis*. Even if the words or actions of the corrections officers were not designed to elicit an incriminating response, should the officers have realized that their conduct would, in fact, elicit an incriminating response? In other words, should the officers have realized that their actions, while not coercive, were being interpreted as coercive by the suspect, Tucker, so that Tucker felt compelled to speak?

{¶ 29} Our answer to this question is "no." The concept of "functional equivalent of questioning" compulsion would have to be extended beyond its recognized boundaries as explained in *Innis* in order that "functional equivalent" compulsion sufficient to invoke the *Miranda* principles be found on the facts of this

case.[1] On the record before us, the officers reasonably should not have anticipated that their actions or words would be likely to evoke an incriminating response.

{¶ 30} Tucker himself is the one who voluntarily turned the conversation to the subject of Herring's killing. Tucker told the guards he was going to plead guilty, because then he could "start [his] time" and get this "over." Any further interaction between Tucker and the guards was a continuation of the conversation and flowed from the initial volunteered incriminating statement of Tucker.

{¶ 31} Even given the guards' knowledge of Tucker's past mental health counseling, and given their awareness of his uneasiness over seeing coverage of Brock's trial on television, their interaction with him has all the earmarks of casual conversation. The officers were simply looking out for Tucker's well-being. They engaged him in casual conversation, as they had in the past when they observed he was anxious or nervous, and were attempting to calm him.

{¶ 32} Tucker had never confessed any details in the past to them of his participation in the events at Herring's home, and there was no reason for them to anticipate that he would confess this time. Deputy Garwood testified at the suppression hearing that he was a Logan County deputy, and that he really did not know the details of Tucker's case, because Tucker was a suspect in Shelby County and was to be tried in Shelby County. Moreover, the musings of Deputy Garwood that "when this is all said and done, I'd like to hear about what happened that day" were not "reasonably likely to elicit an incriminating response."

{¶ 33} This statement by the corrections officer was similar to the officers' statements at issue in *Innis* that were characterized by the United States Supreme Court as "offhand remarks." 446 U.S. at 303, 100 S.Ct. at 1691, 64 L.Ed.2d at 309.

---

1. In *Innis*, 446 U.S. at 303, 100 S.Ct. at 1691, 64 L.Ed.2d at 309, the Supreme Court pointed out that "subtle compulsion" must not be equated with interrogation. Even if a suspect can be said to have been subjected to "subtle compulsion," "[i]t must also be established that a suspect's incriminating response was the product of words or actions on the part of the police that they should have known were reasonably likely to elicit an incriminating response." (Footnote omitted.)

"[T]he police surely cannot be held accountable for the unforeseeable results of their words or actions." *Id*., 446 U.S. at 301-302, 100 S.Ct. at 1690, 64 L.Ed.2d at 308. We conclude that Tucker was not "interrogated," so that he was not subjected to the "functional equivalent" of questioning. Therefore, his entire statement must be considered to have been voluntarily made. "Volunteered statements of any kind are not barred by the Fifth Amendment and their admissibility is not affected by our holding today." *Miranda*, 384 U.S. at 478, 86 S.Ct. at 1630, 16 L.Ed.2d at 726.

{¶ 34} Moreover, there is no requirement that officers interrupt a suspect in the course of making a volunteered statement to recite the *Miranda* warnings. As Tucker himself voluntarily turned the conversation to the Herring killing, and the rest of the conversation was a continuation in the same vein, Tucker cannot be said to have been interrogated. The guard's statement that "you don't have to talk about it" (produced in response to Tucker's statement about talking "if it doesn't go any further") was merely one comment made as part of the ongoing conversation.

{¶ 35} While it is obvious that the guard's statement is no substitute for *Miranda* warnings, it does not have to be, because *Miranda* warnings were not required. This statement, which clearly shows that the guards were not putting pressure on Tucker, further supports that the entire interaction between Tucker and the guards was an ongoing casual conversation.

{¶ 36} For all the foregoing reasons, we reverse the judgment of the court of appeals on this issue. Tucker's motion to suppress was properly denied by the trial court.

II

{¶ 37} When Daniel Brock was called to the stand outside the presence of the jury in Tucker's trial, he invoked his Fifth Amendment rights and did not testify. The trial court declared Brock to be unavailable as a witness. The state then called to testify outside the presence of the jury Deputy Sheriff Doug Schlagetter, a

detective with the Shelby County Sheriff's Department. Schlagetter recounted how he had interviewed Brock on the date of Brock's arrest, March 31, 1994.

**{¶ 38}** Schlagetter had advised Brock of his *Miranda* rights, Brock agreed to waive those rights, and Schlagetter proceeded to inquire of Brock about the Herring murder. The more than an hour interview, wherein Brock related a version of what happened at the Herring house on March 9, 1994, was recorded on audio tape.

**{¶ 39}** Schlagetter told the trial judge of the circumstances surrounding the making of Brock's statements, and referred generally to the contents of the tape without getting into specifics. Schlagetter testified that, from the answers given by Brock at the time, as well as from later evidence acquired during the investigation regarding the Herring murder, it became evident that Brock had told him "numerous lies" during the interview. Schlagetter also agreed on cross-examination that a constant theme in Brock's story was an attempt to shift the blame to Tucker and away from Brock. Schlagetter did not testify to the jury at this point in the trial, and the question of the tape's admissibility was deferred to a later time.

**{¶ 40}** Later on in the trial, the trial court heard arguments outside the presence of the jury from the attorneys on whether Brock's taped statements should be played for the jury. The trial court ruled the tape admissible under Evid.R. 804(B)(3),[2] as a statement against Brock's interest. Schlagetter took the witness stand, this time in the presence of the jury, and testified to the circumstances of

---

2. Evid.R. 804(B) provides:

"*Hearsay exceptions*. The following are not excluded by the hearsay rule if the declarant is unavailable as a witness:

"* * *

"(3) *Statement against interest*. A statement that was at the time of its making so far contrary to the declarant's pecuniary or proprietary interest, or so far tended to subject the declarant to civil or criminal liability, or to render invalid a claim by the declarant against another, that a reasonable person in the declarant's position would not have made the statement unless the declarant believed it to be true. A statement tending to expose the declarant to criminal liability, whether offered to exculpate or inculpate the accused, is not admissible unless corroborating circumstances clearly indicate the trustworthiness of the statement."

Brock's taped statements. Brock's taped statements were then played for the jury, after the trial judge instructed the jury to listen "with due regard and grave caution."

{¶ 41} For much of the tape, Brock repeatedly denied that he had fired either of the shots at Herring, and claimed that Tucker had shot Herring twice, with different guns. Brock claimed that Burnham and Tucker were out to pin the Herring murder on him, and that he was afraid of Tucker. Finally, near the end of the session, Brock admitted that he shot Herring with a shotgun, after Tucker had shot Herring first. Brock claimed that Tucker threatened to shoot him if he did not fire at Herring.

{¶ 42} After the tape was played, Schlagetter on cross-examination verified that many of the details in Brock's story were inconsistent with the other evidence that had been discovered during the investigation of the Herring case.

{¶ 43} At issue is whether Brock's taped statements should have been used against Tucker. This case potentially raises the questions of whether the trial court abused its discretion in admitting Brock's taped statements against Tucker under Evid.R. 804(B)(3), as well as whether the admission of the taped statements violated Tucker's Sixth Amendment right to confront adverse witnesses.

{¶ 44} Tucker urges that, based on the facts of this case, this court should "follow the lead" of the United States Supreme Court in *Williamson v. United States* (1994), 512 U.S. 594, 114 S.Ct. 2431, 129 L.Ed.2d 476. In *Williamson*, the Supreme Court clarified the scope of Fed.R.Evid. 804(b)(3), the federal version of the hearsay exception for statements against penal interest, and determined that Fed.R.Evid. 804(b)(3) "does not allow admission of non-self-inculpatory statements, even if they are made within a broader narrative that is generally self-inculpatory." 512 U.S. at 600-601, 114 S.Ct. at 2435, 129 L.Ed.2d at 483.[3]

---

3. The Supreme Court in *Williamson*, 512 U.S. at 605, 114 S.Ct. at 2437, 129 L.Ed.2d at 486, made clear that its decision was based solely on its interpretation of Fed.R.Evid. 804(b)(3), and was not dependent on Confrontation Clause analysis.

**{¶ 45}** Tucker argues that this court should divide Brock's statements into self-inculpatory (admissible) and self-exculpatory (inadmissible) portions. Tucker further argues that, if *Williamson's* interpretation of Fed.R.Evid. 804(b)(3) is determined by this court to apply to Ohio's Evid.R. 804(B)(3), then the trial court should have admitted only a very small part of Brock's statements—the part in which Brock admitted shooting Herring—so that the trial court erred in admitting the statements in their entirety.[4]

**{¶ 46}** The trial court found the statements to be admissible under the hearsay exception of Evid.R. 804(B)(3) as being against Brock's interest, relying on *State v. Gilliam* (1994), 70 Ohio St.3d 17, 635 N.E.2d 1242. In *Gilliam*, this court found that the admission of a co-defendant's taped statement after the co-defendant became unavailable to testify did not violate the defendant's Sixth Amendment right to confront adverse witnesses. The court determined that the trial court did not abuse its discretion, because the statement at issue was clearly a statement against interest, in that it clearly tended to subject the declarant to criminal liability. *Id.*, 70 Ohio St.3d at 20, 635 N.E.2d at 1245. Furthermore, the *Gilliam* court found that corroborating circumstances indicated the trustworthiness of the statement. 70 Ohio St.3d at 20-21, 635 N.E.2d at 1246.

**{¶ 47}** The state urges that "[i]nconsistencies in a co-defendant's confession, which confession is otherwise corroborated by extrinsic circumstances, are relevant to its weight rather than its admissibility." The state, while acknowledging that Brock's statements are fraught with inconsistencies, points out that some of the details included in Brock's statements, for example that he, Tucker, and Burnham were all at the Herring house, are accurate. The state argues that,

---

4. The state points out in its brief that Tucker argued at trial only that Brock's statements were inadmissible in their entirety—and that Tucker never argued to the trial court that the statements could be divided into admissible and inadmissible portions, with only the self-inculpatory statements of Brock played to the jury.

pursuant to *Gilliam*, the best course in this situation is for the trial court to give a limiting instruction to the jury, and then to admit the full statements, with the jury itself evaluating which parts of the statements are truthful and which are not.

**{¶ 48}** We recognize that there are significant factors present in this case that arguably were not present in *Gilliam*. The court of appeals found that the taped statements should not have been admitted against Tucker because the statements were not truly against Brock's interest, and also found, without citation, that "the corroborating circumstances required for admission of this type of hearsay statement clearly do not exist."

**{¶ 49}** We need not resolve whether Brock's taped statements should have been admitted by the trial court. In *State v. Williams,* at paragraph six of the syllabus, this court held that "[w]here constitutional error in the admission of evidence is extant, such error is harmless beyond a reasonable doubt if the remaining evidence, standing alone, constitutes overwhelming proof of defendant's guilt." Because the record demonstrates that overwhelming proof of Tucker's guilt was presented at trial without reference to Brock's taped statements, the admission of those statements, if error, was harmless error.

**{¶ 50}** The essentially uncontroverted testimony of other witnesses at Tucker's trial, particularly of Shawn Burnham, Shanda Grieves, and Deputy Garwood, provided overwhelming proof sufficient to convince the jury of Tucker's guilt. In addition, physical and circumstantial evidence supported the state's theory of events that took place. A unique facet of this case is the amount of credible evidence available for the jury to use as a basis to evaluate Brock's statements.

**{¶ 51}** It is extremely doubtful that the admission of Brock's taped statements actually could have misled the jury in this case. There can be little doubt after examining the record that no reasonable juror would have accepted Brock's versions of events, as related on the tape, as plausible. No rational jury member could have put much value on Brock's statements as proving "the truth of the

matter[s] asserted" by Brock. See Evid.R. 801(C). Most of the tape was so transparently self-serving toward Brock's attempts to exonerate himself that it is doubtful that the tape had much probative value at all.

**{¶ 52}** Among the factors that point to the tape's lack of influence on the jury verdict are the following:

• Brock's statements on the tape directly contradicted the eyewitness testimony offered by Burnham. While Brock attempted to place blame on Tucker for orchestrating the robbery and committing the killing, Burnham's testimony, already heard by the jury, established that Brock was the organizer of the trip, and that Brock was by no means an unwilling participant. Rather than making Tucker appear more guilty, the unlikeliness of Brock's statements, when contrasted with Burnham's testimony, tended to indicate that Brock's statements were at best an improbable effort at self-exculpation.

• The taped statements themselves are a disjointed series of responses to questions, and are riddled with internal inconsistencies, the most glaring of which is that Brock repeatedly denies that he shot Herring, until, near the end of the tape, he does an about face and admits to it (with the hollow claim that Tucker made him do it).

• Detective Schlagetter, who testified before and after the tape was played, stated for the jury that there were obvious inconsistencies in Brock's versions of events.

• The trial court gave the jury a limiting instruction, telling the jurors to listen to Brock's statements with caution.

**{¶ 53}** For all the reasons detailed above, we determine that Tucker was not prejudiced by the trial court's admission of the tape into evidence, so that the trial court's decision to allow the tape to be played, if error, was harmless error.

### III

**{¶ 54}** In conclusion, we determine that Tucker's statement was not the product of an "interrogation," so that the trial court properly denied the motion to suppress. In addition, we find that regardless of whether Brock's taped statements were improperly admitted into evidence against Tucker, the admission of the statements was harmless error. Accordingly, we reverse the judgment of the court of appeals granting Tucker a new trial, reinstate the judgment of the trial court on the jury's verdict, and sustain Tucker's convictions and sentence.

*Judgment reversed.*

DOUGLAS, F.E. SWEENEY, COOK and LUNDBERG STRATTON, JJ., concur.

MOYER, C.J., and PFEIFER, J., dissent.

————————————

**PFEIFER, J., dissenting.**

{¶ 55} I dissent from the majority opinion because allowing both Tucker's statement and Brock's statements into evidence constituted prejudicial error, which required a reversal of Tucker's convictions.

I

{¶ 56} Coercion can occur in places other than the back seat of a police cruiser or in a stifling hot interrogation room with a single light bulb shining in an accused's face. The "good cop/bad cop" treatment is not a necessary ingredient in coercing an incriminating statement. In this case, we see the coercive effect of the "good cop/good cop" treatment.

{¶ 57} In *Rhode Island v. Innis* (1980), 446 U.S. 291, 301, 100 S.Ct. 1682, 1689-1690, 64 L.Ed.2d 297, 308, the court recognized that subtle persuasion can constitute a form of interrogation:

"[T]he term 'interrogation' under *Miranda* refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect. The latter portion of this definition focuses primarily upon the perceptions of the suspect, rather than the intent of the police."

{¶ 58} Tucker's perception obviously was that he was among friends. Garwood and Bailey had taken Tucker from the day room, away from the other prisoners, and into a separate room. They had given him a cigarette and a drink. Tucker believed his statements would be kept just among the three of them. As the court stated further in *Innis*:

"Any knowledge the police may have had concerning the unusual susceptibility of a defendant to a particular form of persuasion might be an important factor in determining whether the police should have known that their

words or actions were reasonably likely to elicit an incriminating response from the suspect." *Id.* at 302, 100 S.Ct. at 1690, 64 L.Ed.2d at 308, fn. 8.

{¶ 59} Tucker was in an agitated state. The guards knew that he was in that state because he had been viewing Brock's trial. The majority admits that in the past Tucker had told the guards that it helped him to talk about the crime to get it off his chest and help him sleep. Knowing that Tucker was agitated and that telling his story made him feel better, one guard stated that he would like to hear Tucker's story. The guards should have known that the request would likely yield an incriminating response. Any doubt should have been resolved when Tucker prefaced his remarks with the admonition that his story would go no further.

{¶ 60} The guards' treatment of Tucker was the functional equivalent of questioning—they took him to a secluded room, made him comfortable, and basically asked him to confess. Tucker was clear that he would not talk if he were not among friends and made it clear that he would tell the guards what happened only if it went no further, *i.e.*, only if what he said would not be used against him in a court of law. I would find that *Miranda* warnings were required, and that Tucker's motion to suppress should have been granted.

II

{¶ 61} The majority seems to agree that the trial court erred in admitting the entirety of Brock's statements into evidence. The statements, rather than falling under the hearsay exception for statements against interest, were almost entirely in Brock's interest, blaming the crime on Tucker. Unlike the majority, I do not believe that the remaining evidence against Tucker is overwhelming, and would affirm the appellate court's granting of a new trial.

MOYER, C.J., concurs in the foregoing dissenting opinion.

_____