**Louis Allen TUCKER, Petitioner,**

v.

**WARDEN, OHIO STATE PENITENTIARY, et al., Respondents.**

No. C–3–99–168.

United States District Court, S.D. Ohio, Western Division.

Sept. 4, 2001.

John Fenlon, Columbus, OH, for Petitioner.

---

Mark Zemba, Ohio Atty. General, Cleveland, OH, for Respondents.

DECISION AND ENTRY OVERRULING PETITIONER'S OBJECTIONS (DOC. #17) TO MAGISTRATE JUDGE'S SUPPLEMENTAL REPORT AND RECOMMENDATIONS (DOC. #14); MAGISTRATE JUDGE'S SUPPLEMENTAL REPORT AND RECOMMENDATIONS (DOC. #14) ADOPTED; PETITIONER'S PETITION FOR WRIT OF HABEAS CORPUS (DOC. #1) DENIED; JUDGMENT TO BE ENTERED IN FAVOR OF RESPONDENTS AND AGAINST PETITIONER; TERMINATION ENTRY

RICE, Chief Judge.

Petitioner Louis Allen Tucker commenced this action on April 21, 1999, by filing a Petition for a Writ of Habeas Corpus to obtain his release from the Ohio State Penitentiary. (Doc. #1). On December 6, 1999, Magistrate Judge Michael R. Merz filed a Report and Recommendations (Doc. #8), in which he recommended that no writ should issue. That judicial officer later withdrew his Report and Recommendations and ordered additional briefing, in light of *Williams v. Taylor*, 529 U.S. 362, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000). (Doc. #11). After reviewing the parties' additional submissions, the Magistrate Judge filed a Supplemental Report and Recommendations (Doc. #14), once again recommending that no writ should issue. The matter is now before the Court upon Tucker's Objections (Doc. #17) to that Supplemental Report and Recommendations.

I. *Procedural Background*

In March, 1995, a jury convicted Tucker of aggravated murder and aggravated robbery for his role in the shooting death of an individual named Thomas Herring.

The trial court imposed a total sentence of 43 years to life in prison. On appeal, the Ohio Third District Court of Appeals reversed Tucker's conviction and sentence, by a 2–1 vote, finding: (1) that the trial court should have suppressed a statement he made in jail while awaiting trial; and (2) that the trial court erred in allowing the jury to hear a taped statement from accomplice Daniel Brock, who also shot Herring. By a 5–2 vote, the Ohio Supreme Court reversed the judgment of the state appellate court. *See State v. Tucker*, 81 Ohio St.3d 431, 692 N.E.2d 171 (1998). Although Tucker was in custody when he made his jailhouse statement, without *Miranda* warnings being given, the majority held that the statement was not the result of "interrogation." As a result, the majority reasoned that the trial court properly had denied Tucker's motion to suppress. *Id.* at 177. With respect to the second issue, the Ohio Supreme Court declined to decide whether the trial court had erred by allowing the jury to hear the taped statement from Brock, who had invoked his Fifth Amendment rights and refused to testify. Even if the trial court had erred in this regard, the majority reasoned that the error was harmless beyond a reasonable doubt, in light of Tucker's jailhouse statement and the other evidence against him. *Id.* at 179.

As noted above, Tucker then commenced the present action by filing his Petition for a Writ of Habeas Corpus, pursuant to 28 U.S.C. § 2254. (Doc. #1). Therein, he asserts two grounds for relief. *First*, he contends that the trial court violated his Sixth Amendment right to confrontation by allowing the jury to hear Brock's taped statement. *Second*, he argues that the trial court violated his Fifth Amendment right against self-incrimination by refusing to suppress his jailhouse statement. In support, Tucker insists that

his statement was the product of an unlawful custodial interrogation.

In his initial Report and Recommendations, the Magistrate Judge agreed that the introduction of Brock's taped statement violated Tucker's Sixth Amendment rights. (Doc. # 8 at 7). With respect to the Fifth Amendment issue, the Magistrate Judge found that reasonable minds could differ as to whether Tucker's jailhouse statement was the product of a "custodial interrogation." As a result, that judicial officer determined that the Ohio Supreme Court's finding of no Fifth Amendment violation was not an "unreasonable application" of *Rhode Island v. Innis*, 446 U.S. 291, 100 S.Ct. 1682, 64 L.Ed.2d 297 (1980). Therefore, the Magistrate Judge concluded that Tucker was not entitled to habeas relief on the basis of his Fifth Amendment claim. (*Id.* at 12). Finally, the Magistrate Judge found that the violation of Tucker's Sixth Amendment right to confrontation was harmless error, in light of his own jailhouse confession and the other evidence against him. (*Id.* at 13–14).

The United States Supreme Court subsequently issued its opinion in *Williams,* addressing the standard of review that a federal habeas court must apply under § 2254.[1] In response to that ruling, the Magistrate Judge withdrew his Report and Recommendations and, after additional briefing, revisited the issues raised by the Petitioner. On December 28, 2000, that judicial officer filed his Supplemental Report and Recommendations, reaffirming his prior conclusions under the *Williams* standard. (Doc. # 14). In particular, the

Magistrate Judge once again found: (1) a violation of Tucker's Sixth Amendment right to confrontation; (2) no basis for habeas relief with respect to the Fifth Amendment issue, given that the Ohio Supreme Court's ruling was not an "unreasonable application" of *Innis;* and (3) that the Sixth Amendment violation constituted harmless error, in light of the other evidence of Tucker's guilt.

Tucker has filed timely Objections (Doc. # 17) to the Magistrate Judge's Supplemental Report and Recommendations. Therein, he contests the Magistrate Judge's conclusion that the Ohio Supreme Court's ruling did not involve an unreasonable application of *Innis.* Tucker insists that under a reasonable application of *Innis,* his jailhouse statement plainly was the product of a custodial interrogation, in violation of his Fifth Amendment rights. (*Id.* at 10–15). With respect to the Sixth Amendment issue, Tucker challenges the Magistrate Judge's finding of harmless error. Based on the premise that his own jailhouse statement should have been suppressed, Tucker argues that the admission of Brock's taped statement did not constitute harmless error.[2] (*Id.* at 7–10). Finally, Tucker suggests that the admission of Brock's taped statement was not harmless error, even if the trial court properly admitted testimony about his own jailhouse statement. (*Id.* at 9–10).

II. *Analysis*

Given that Tucker filed his Petition for a Writ of Habeas Corpus after the effective date of the Antiterrorism and Effective

---

1. The Court will discuss *Williams* more fully, *infra.*

2. In his Supplemental Report and Recommendations, the Magistrate Judge agreed that if Tucker's jailhouse statement should have been suppressed, then it cannot be said that the introduction of Brock's taped statement was harmless error. In other words, in the Magistrate Judge's view, the introduction of Brock's taped statement constituted harmless error *only if* testimony about Tucker's jailhouse statement (in which he confessed to shooting Thomas Herring) was properly admitted into evidence.

Death Penalty Act of 1996 ("AEDPA"), which amended 28 U.S.C. § 2254, the AEDPA governs the Court's review of the state-court decisions in this case. Under § 2254(d), as amended, the Court may not grant a writ of habeas corpus as to any claim adjudicated on the merits in state court, unless the state-court adjudication:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d)(1)-(2).

In the present case, Tucker insists that, contrary to the Magistrate Judge's finding, the Ohio Supreme Court's analysis of his Fifth Amendment claim involved an unreasonable application of *Innis*. In *Williams*, the United States Supreme Court explained that an "unreasonable application" occurs when "the state court identifies the correct legal principle from this Court's decision but unreasonably applies that principle to the facts of the prisoner's case." *Williams*, 529 U.S. at 406, 120 S.Ct. 1495. The *Williams* Court further explained that a federal habeas court may not find a state-court adjudication to be "unreasonable," within the meaning of § 2254(d)(1), "simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously

or incorrectly." [3] *Id.* at 411, 120 S.Ct. 1495. In other words, as the Magistrate Judge properly noted, it is not enough for this Court to find that it disagrees with the conclusion reached by the Ohio Supreme Court. Such a finding is a necessary, but not sufficient, predicate to the granting of habeas relief. This Court also must find that the decision of the Ohio Supreme Court was "objectively unreasonable," in the sense that it involved an objectively unreasonable application of clearly established Supreme Court precedent. *Id.* at 409, 120 S.Ct. 1495.

■ With the foregoing principles in mind, the Court turns now to its review of the Ohio Supreme Court's application of *Innis* to the facts of the present case.[4] In *Innis*, the U.S. Supreme Court recognized that the term "interrogation" includes more than "those police interrogation practices that involve express questioning of a defendant...." *Innis*, 446 U.S. at 298, 100 S.Ct. 1682. It also encompasses more subtle "techniques of persuasion," which, while not involving express questioning, may be extremely coercive. *Id.* at 299–300, 100 S.Ct. 1682. The *Innis* Court recognized, however, that "[a]ny statement given freely and voluntarily without any compelling influences is, of course, admissible in evidence." *Id.* As the Ohio Supreme Court noted, "to determine to determine whether a suspect has been 'interrogated,' the heart of the inquiry focuses on police coercion, and whether the suspect has been compelled to speak

---

3. In *Williams*, the Court settled a dispute among the federal circuit courts as to the meaning of the "unreasonable application" clause of § 2254(d)(1). In so doing, the Court articulated the standard discussed herein, which is less deferential to state-court adjudications than the standard applied in prior Sixth Circuit cases such as *Nevers v. Killinger*, 169 F.3d 352 (6th Cir.1999). In light of *Williams*, this Court need not discuss the *Nev-*

ers standard, which, as the Sixth Circuit has recognized, "no longer correctly state[s] the law...." *Harris v. Stovall*, 212 F.3d 940, 943 (6th Cir.2000).

4. Tucker does not dispute that *Innis* qualifies as the controlling "clearly established federal law as determined by the Supreme Court of the United States." *See* 28 U.S.C. § 2254(d)(1).

by that coercion. This compulsion can be brought about by express questioning, but also can be brought about by the 'functional equivalent' of express questioning, i.e., 'any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect.' " *Tucker*, 692 N.E.2d at 175, quoting *Innis*, 446 U.S. at 300–01, 100 S.Ct. 1682 (footnotes omitted).

Having set forth the applicable legal principles, the Court now must review the facts to which those principles were applied by the Ohio Supreme Court. Notably, Tucker does not dispute the "historical facts" leading up to, and including, his jailhouse statement. (Doc. # 1 at 23). In its decision, the Ohio Supreme Court recited those facts as follows:

> After his apprehension in Kentucky, Tucker was brought to the Logan County Jail on April 12, 1994, and held there while awaiting trial. Tucker was in a "day room" with several other inmates at the jail on December 4, 1994, when corrections officers guarding him noticed that he was nervous and "wasn't himself." Tucker had been watching television news coverage of Brock's separate trial.
>
> The guards, Logan County Deputy Sheriff Larry Garwood and Jail Corporal Phil Bailey, also with the Logan County Sheriff's Department, decided to remove Tucker from the day room and to take him to another room in the jail, away from other prisoners. The guards gave him a cigarette and a soft drink, in an effort to calm him down. Tucker had undergone some mental health counseling while being detained, and the guards asked him if he wanted them to contact a mental health professional to come to the jail. Tucker told them that he did not want a counselor. Tucker began talking about Brock's trial to the guards,

telling them he wished "this would just get over" so he could "start [his] time." He had in the past told the guards that it helped him to talk about it and to get it off his chest because it helped him sleep. Tucker told the guards he was going to plead guilty when he was tried (unless Brock got the death penalty, because he wouldn't plead guilty then). At this point, one of the guards remarked, "when this is all said and done, I'd like to hear about what happened that day." Tucker stated that he would tell them "right now" what happened "if it doesn't go any further." One of the guards said, "you don't have to talk about it." Tucker said it helped him to talk about it, and proceeded to tell the guards of the plan he and Brock came up with to rob Thomas Herring's house of the guns, describing the shootings of Herring in the kitchen and the taking of Herring's guns.

*Tucker*, 692 N.E.2d at 174.

In light of *Williams*, the narrow issue before this Court is whether the Ohio Supreme Court applied the legal principles established in *Innis* to the foregoing facts in an objectively unreasonable manner. Upon review, the Court concludes that it did not. In support of its determination that Tucker's jailhouse statement was not the product of an "interrogation," the Ohio Supreme Court reasoned as follows:

> Initially, there is no evidence in the record of any *actual* coercive practices employed by the corrections officers. It is clear that no actual express questioning, in the sense of the first prong of *Miranda* regarding "interrogation," occurred in this case. Furthermore, the officers cannot be said to have designed their words or actions in an attempt to elicit an incriminating response from Tucker, so that it is apparent that the officers did not invite, nor did they ex-

pect, a response. The testimony of the corrections officers regarding the making of Tucker's statement reveals that no questions meant to elicit information from Tucker about the incidents at the Herring home were voiced. However, pursuant to *Innis,* the inquiry does not stop there. In this context, what the officers should have known as to the reasonable impact their statements would have had on Tucker is just as important.

Our inquiry thus focuses on the second, "functional equivalent," interrogation prong of *Miranda,* as discussed in *Innis.* Even if the words or actions of the corrections officers were not designed to elicit an incriminating response, should the officers have realized that their conduct would, in fact, elicit an incriminating response? In other words, should the officers have realized that their actions, while not coercive, were being interpreted as coercive by the suspect, Tucker, so that Tucker felt compelled to speak?

Our answer to this question is "no." The concept of "functional equivalent of questioning" compulsion would have to be extended beyond its recognized boundaries as explained in *Innis* in order that "functional equivalent" compulsion sufficient to invoke the *Miranda* principles be found on the facts of this case. On the record before us, the officers reasonably should not have anticipated that their actions or words would be likely to evoke an incriminating response.

Tucker himself is the one who voluntarily turned the conversation to the subject of Herring's killing. Tucker told the guards he was going to plead guilty, because then he could "start [his] time" and get this "over." Any further interaction between Tucker and the guards was a continuation of the conversation and flowed from the initial volunteered incriminating statement of Tucker.

Even given the guards' knowledge of Tucker's past mental health counseling, and given their awareness of his uneasiness over seeing coverage of Brock's trial on television, their interaction with him has all the earmarks of casual conversation. The officers were simply looking out for Tucker's well-being. They engaged him in casual conversation, as they had in the past when they observed he was anxious or nervous, and were attempting to calm him.

Tucker had never confessed any details in the past to them of his participation in the events at Herring's home, and there was no reason for them to anticipate that he would confess this time. Deputy Garwood testified at the suppression hearing that he was a Logan County deputy, and that he really did not know the details of Tucker's case, because Tucker was a suspect in Shelby County and was to be tried in Shelby County. Moreover, the musings of Deputy Garwood that "when this is all said and done, I'd like to hear about what happened that day" were not "reasonably likely to elicit an incriminating response."

This statement by the corrections officer was similar to the officers' statements at issue in *Innis* that were characterized by the United States Supreme Court as "offhand remarks." 446 U.S. at 303, 100 S.Ct. at 1691, 64 L.Ed.2d at 309. "[T]he police surely cannot be held accountable for the unforeseeable results of their words or actions." *Id.,* 446 U.S. at 301–302, 100 S.Ct. at 1690, 64 L.Ed.2d at 308. We conclude that Tucker was not "interrogated," so that he was not subjected to the "functional equivalent" of questioning. Therefore, his entire statement must be considered to have been voluntarily made. "Volun-

teered statements of any kind are not barred by the Fifth Amendment and their admissibility is not affected by our holding today." *Miranda*, 384 U.S. at 478, 86 S.Ct. at 1630, 16 L.Ed.2d at 726.

Moreover, there is no requirement that officers interrupt a suspect in the course of making a volunteered statement to recite the *Miranda* warnings. As Tucker himself voluntarily turned the conversation to the Herring killing, and the rest of the conversation was a continuation in the same vein, Tucker cannot be said to have been interrogated. The guard's statement that "you don't have to talk about it" (produced in response to Tucker's statement about talking "if it doesn't go any further") was merely one comment made as part of the ongoing conversation.

While it is obvious that the guard's statement is no substitute for *Miranda* warnings, it does not have to be, because *Miranda* warnings were not required. This statement, which clearly shows that the guards were not putting pressure on Tucker, further supports that the entire interaction between Tucker and the guards was an ongoing casual conversation.

*Id.* at 175–77 (footnote omitted).

In opposition to the foregoing analysis, the two dissenting members of the Ohio Supreme Court viewed the facts differently, reasoning as follows:

Tucker was in an agitated state. The guards knew that he was in that state because he had been viewing Brock's trial. The majority admits that in the past Tucker had told the guards that it helped him to talk about the crime to get it off his chest and help him sleep. Knowing that Tucker was agitated and that telling his story made him feel better, one guard stated that he would like to hear Tucker's story. The guards should have known that the request would likely yield an incriminating response. Any doubt should have been resolved when Tucker prefaced his remarks with the admonition that his story would go no further.

The guards' treatment of Tucker was the functional equivalent of questioning-they took him to a secluded room, made him comfortable, and basically asked him to confess. Tucker was clear that he would not talk if he were not among friends and made it clear that he would tell the guards what happened only if it went no further, i.e., only if what he said would not be used against him in a court of law. I would find that *Miranda* warnings were required, and that Tucker's motion to suppress should have been granted.

*Id.* at 180 (Pfeifer, J., and Moyer, C.J., dissenting).

■ Upon review, the Court believes that the issue of whether Tucker's statement was the product of an "interrogation," thereby necessitating *Miranda* warnings, is a close question. As noted above, however, the issue in the present case *is not* whether the ruling by the Ohio Supreme Court was "correct." Rather, in the context of federal habeas review, the issue is whether the Ohio Supreme Court's analysis involved an objectively unreasonable application of *Innis* to the facts of this case. Regardless of whether this Court agrees or disagrees with the conclusion reached by the Ohio Supreme Court, it cannot say that the Ohio Supreme Court's application of law to facts was an objectively unreasonable one. As the Magistrate Judge properly noted in his Supplemental Report and Recommendations, the five-member majority of the Ohio Supreme Court quite reasonably applied the legal principles set forth in *Innis* to the facts of this case. (Doc. # 14 at 5–6). The majority and the dissent simply viewed the facts

differently and drew different inferences from them. Regardless of whether the majority reached the "correct" result, the Court concludes that it engaged in an *objectively reasonable* application of law to fact.[5]

Finally, for the reasons set forth by the Magistrate Judge in both his Report and Recommendations (Doc. # 8) and his Supplemental Report and Recommendations (Doc. # 14), the Court agrees that the introduction of Brock's taped statement violated Tucker's Sixth Amendment right of confrontation.[6] The Court also agrees, for the reasons articulated by the Magistrate Judge (*see* Doc. # 8 at 12–14, Doc. # 14 at 6), that the Sixth Amendment violation constituted harmless error, in light of Tucker's jailhouse confession and the other evidence against him.[7] As a result, the Court concludes that Tucker is not entitled to a Writ of Habeas Corpus, and his Petition for the same will be denied.

### III. *Conclusion*

Based on the reasoning and citation of authority set forth above, the Court concludes that the Petitioner has not established his entitlement to a Writ of Habeas Corpus. The Petitioner's Objections (Doc. # 17) to the Magistrate Judge's Supplemental Report and Recommendations (Doc. # 14) are overruled. The Court hereby adopts the Supplemental Report and Recommendations (Doc. # 17) filed by the Magistrate Judge. The Petitioner's Petition for a Writ of Habeas Corpus (Doc. # 1) is denied.

---

**5.** In opposition to this conclusion, Tucker insists that *Innis* is factually distinguishable. He also argues that the Ohio Supreme Court failed to give sufficient weight to his mental instability. (Doc. # 17 at 10–15). Even if true, these arguments do not demonstrate that the Ohio Supreme Court's analysis involved an objectively unreasonable application of *Innis* to the facts of this case. The Court does not dispute that *Innis* and the present case are factually distinguishable. Indeed, the Ohio Supreme Court never suggested that the two cases were factually identical. The Ohio Supreme Court simply applied the *legal principles* in *Innis* to the facts of this case. In so doing, the five-member majority may have placed less emphasis on certain facts than Tucker (or the dissenting Justices) would have liked. Upon review, however, this Court simply cannot agree with Tucker's argument that the Ohio Supreme Court applied *Innis* to the facts of this case in an objectively unreasonable manner.

Finally, Tucker contends the fact "that four of the ten state appellate judges who have now reviewed [his] claims have found constitutional error, should give pause to this Court." (Doc. # 1 at 2). This fact certainly suggests that the issue of whether Tucker's statement was the product of an "interrogation" presents a close question. Indeed, this Court has conceded as much, *supra*, in its analysis. As noted above, however, the issue is not whether the ruling by the Ohio Su-

preme Court was "correct." Rather, the issue is whether the Ohio Supreme Court's analysis involved an objectively unreasonable application of *Innis*. For the reasons set forth above, the Court concludes that it did not. Parenthetically, the fact that six of ten state appellate jurists have found no violation of the Fifth Amendment lends at least some support to this Court's determination that their conclusion, even if incorrect, was based on an objectively reasonable application of law to fact. In any event, the Court's ruling herein does not turn on the number of state-court jurists who did, or did not, find a violation of Tucker's Fifth Amendment rights.

**6.** Tucker understandably does not dispute this determination.

**7.** In opposition to this conclusion, Tucker argues that his jailhouse confession should have been suppressed. The Court has rejected this argument in its analysis, *supra*. Tucker also states, without any analysis, that the introduction of Brock's taped statement was not harmless error, even if testimony about his own jailhouse confession was properly admitted at trial. For the reasons set forth by the Magistrate Judge, the Court finds absolutely no merit in this argument. In light of Tucker's confession and the other evidence, the Court is convinced that the admission of Brock's statement constituted harmless error.

Judgment will be entered in favor of the Respondents and against the Petitioner.

The captioned cause is hereby ordered terminated upon the docket records of the United States District Court for the Southern District of Ohio, Western Division, at Dayton.