**Louis Allen TUCKER, Petitioner–Appellee,**

v.

**WARDEN, OHIO STATE PENITENTIARY, Respondent–Appellant.**

No. 01–4058.

United States Court of Appeals, Sixth Circuit.

May 1, 2003.

Before DAUGHTREY and GIBBONS, Circuit Judges, and MILLS, District Judge.*

## OPINION

MILLS, District Judge.

On March 9, 1994, Thomas Herring's body was found in his home. Herring's death resulted from two gunshot wounds. One of the wounds was caused by a bullet that was fired from a handgun into Herring's upper chest. The other wound was a shotgun blast to Herring's face. Either of these wounds was sufficient to cause Herring's death. Following an investigation of Herring's death, police arrested Shawn Burnham, Daniel Brock, and Louis Allen Tucker.

The State called numerous witnesses to testify against Tucker. One witness, Deputy Sheriff Larry Garwood, recounted an admission Tucker made while in Logan County Jail awaiting trial. Deputy Garwood testified that on December 4, 1994, Tucker was in the Logan County Jail awaiting trial. Tucker had been watching television news coverage of Brock's separate trial in a "day room" with several other inmates when corrections officers noticed that he was nervous and "wasn't himself." Deputy Garwood and Jail Corporal Phil Bailey decided to remove Tucker from the day room and take him to another room in the jail. In an effort to

* The Honorable Richard Mills, Senior United States District Judge for the Central District of Illinois, sitting by designation.

calm Tucker, the guards gave him a cigarette and a soft drink. Tucker had undergone some mental health counseling while being detained, and the guards asked him if he wanted them to contact a mental health professional to come to the jail. Tucker told them that he did not want a counselor. He began talking about Brock's trial to the guards, telling them he wished "this would just get over" so he could "start [his] time."

Tucker told the guards he was going to plead guilty unless Brock got the death penalty. At this point, one of the guards remarked, "when this is all said and done, I'd like to hear about what happened that day." The borderline retarded Tucker, with an I.Q. in the 75–80 range, then stated that he would tell them "right now" what happened "if it doesn't go any further." One of the guards said, "you don't have to talk about it", but Tucker said it helped him to talk about it. Tucker then proceeded to tell the guards of the plan he and Brock came up with to steal Herring's guns. He also described how he shot Herring and stole his guns.

Tucker's attorney moved to suppress the statement and the trial court conducted a suppression hearing. At the hearing, Deputy Garwood and Corporal Bailey testified about the circumstances surrounding Tucker's statement and the details of the statement itself. The trial court considered all of the testimony and decided that Tucker gave his statement voluntarily. The case went to trial and Deputy Garwood testified, over renewed defense objections, about the factual setting and contents of Tucker's statement.

When the State called Daniel Brock to testify at Tucker's trial, Brock took the stand outside the presence of the jury and invoked his Fifth Amendment privilege against self-incrimination. The State then produced a tape recording of a question and answer session Brock and Shelby County deputies engaged in on March 31, 1994. The tape recording contained statements made by Brock about Herring's murder and the theft of Herring's guns. The State played the tape recording to the jury over Tucker's objection.

Tucker presented no witnesses in his defense. The case went to the jury and the jury found Tucker guilty on all counts. The trial court sentenced Tucker to life imprisonment with parole eligibility after thirty years on the aggravated murder count and a lesser sentence for the aggravated robbery charge. *See State v. Tucker,* 1996 WL 354653 (Ohio App. 3 Dist. June 6, 1996) (No. 17–95–10).

In a split decision, the state court of appeals reversed the convictions and sentence and remanded for a new trial. *See State v. Tucker,* 77 Ohio St.3d 1479, 673 N.E.2d 141 (1996) (TABLE, No. 96–1627). The state appellate court found that the trial court should have suppressed Tucker's jail statement because he was subjected to the "functional equivalent of custodial interrogation" without being given Miranda warnings. *Id.* at 4. Furthermore, the court of appeals found that the trial court erred in allowing Brock's taped statements to be played for the jury as evidence against Tucker. *Id.*

The Ohio Supreme Court took the case on discretionary appeal to resolve two issues: (1) whether Tucker was subjected to an "interrogation" by the corrections officers without being given the requisite Miranda warnings; and (2) whether the admission of Brock's taped statements was prejudicial error. *See State v. Tucker,* 81 Ohio St.3d 431, 692 N.E.2d 171, 174 (1998). The Ohio Supreme Court determined that neither of the trial court's decisions warranted reversal. *Id.* It reversed the Ohio Court of Appeals' judgment and reinstated Tucker's convictions. *Id.* at 179.

Tucker subsequently filed a petition for habeas corpus in the United States District Court for the Southern District of Ohio. He alleged that the state trial court violated his Sixth Amendment right to confrontation when it allowed the prosecution to play the audio tape of Brock's question and answer session. Tucker also claimed that Deputy Garwood and Corporal Bailey violated his Fifth Amendment rights when they interrogated him without Mirandizing him. In December 2000, the District Court denied both claims, finding that the Ohio Supreme Court's application of the Fifth and Sixth Amendments to Tucker's case was not objectively unreasonable. *See Tucker v. Warden, Ohio State Penitentiary*, 175 F.Supp.2d 999(S.D.Ohio 2001). Tucker timely appealed that decision on October 3, 2001.

## JURISDICTION AND STANDARD OF REVIEW

This Court has jurisdiction over this case pursuant to 28 U.S.C. §§ 1291, 1294. When reviewing a district court's decision to deny a writ of habeas corpus, the Court uses a de novo standard. *See Rogers v. Howes*, 144 F.3d 990, 992 (6th Cir.1998).

## ANALYSIS

The Antiterrorism and Effective Death Penalty Act, Pub. L. 104–132, 110 Stat. 1214 ("AEDPA") governs habeas petitions filed in federal court subsequent to April 24, 1996. *See Brumley v. Wingard*, 269 F.3d 629, 637 (6th Cir.2001). Since Tucker filed his habeas petition on April 21, 1999, the AEDPA applies to this case. *See Penry v. Johnson*, 532 U.S. 782, 121 S.Ct. 1910, 150 L.Ed.2d 9 (2001).

Pursuant to the AEDPA, a federal court may grant a writ of habeas corpus to a person in custody via a state court judgment only if adjudication of the claim: (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. 28 U.S.C. § 2254(d)(1)-(2). "A federal habeas court making the unreasonable application inquiry should ask whether the State court's application of clearly established federal law was objectively unreasonable." *Williams v. Taylor*, 529 U.S. 362, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000). "[A] federal habeas court may not issue the writ [of habeas corpus] simply because the court concludes in its independent judgment that the relevant state-court decision applied clearly established law erroneously or incorrectly. Rather, the application must also be unreasonable." *Id.* at 411.

### A. Tucker's Confession

■ Statements made by a defendant in response to interrogation while in police custody are not admissible unless the defendant has first been apprised of the constitutional right against self-incrimination and has validly waived this right. *Miranda v. Arizona*, 384 U.S. 436, 478–79, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). The United States Supreme Court has defined "interrogation" as "words or actions on the part of police officers that they should [know are] reasonably likely to elicit an incriminating response." *Rhode Island v. Innis*, 446 U.S. 291, 302, 100 S.Ct. 1682, 64 L.Ed.2d 297 (1980) (emphasis omitted). When deciding whether a defendant has been interrogated, courts should "carefully scrutinize the factual setting of each encounter". *United States v. Avery*, 717 F.2d 1020, 1024 (6th Cir.1983), *cert. denied*, 466 U.S. 905, 104 S.Ct. 1683, 80 L.Ed.2d 157. "Even a relatively innocuous

series of questions may, in light of the factual circumstances and the susceptibility of a particular suspect, be reasonably likely to elicit an incriminating response." *Id.* However, "[a]ny statement given freely and voluntarily without any compelling influences is, of course, admissible in evidence." *Innis,* 446 U.S. at 299–300 (quoting *Miranda,* 384 U.S. at 478).

Tucker's attorney argues that because the guards knew about Tucker's psychological difficulties at the time they removed him from his cell, they should have known that Deputy Garwood's comment "when this is all said and done, I'd like to hear about what happened that day" was likely to evoke an incriminating response in violation of the Fifth Amendment. According to counsel, the Ohio Supreme Court paid very little attention to Tucker's mental condition when it considered whether he had been subjected to the functional equivalent of interrogation. For this reason, counsel contends that the Ohio Supreme Court's decision was objectively unreasonable.

Contrary to counsel's position, the Ohio Supreme Court squarely addressed Tucker's mental condition when it applied *Innis.* The court stated as follows:

> Even given the guards' knowledge of Tucker's past mental health counseling, and given their awareness of his uneasiness over seeing coverage of Brock's trial on television, their interaction with him has all the earmarks of casual conversation. The officers were simply looking out for Tucker's well-being. They engaged him in casual conversation, as they had in the past when they observed he was anxious or nervous, and were attempting to calm him.

Tucker had never confessed any details in the past to them of his participation in the events at Herring's home, and there was no reason for them to anticipate that he would confess this time. Deputy Garwood testified at the suppression hearing that he was a Logan County deputy, and that he really did not know the details of Tucker's case, because Tucker was a suspect in Shelby County and was to be tried in Shelby County. Moreover, the musings of Deputy Garwood that "when this is all said and done, I'd like to hear about what happened that day" were not "reasonably likely to elicit an incriminating response."

This statement by the corrections officer was similar to the officers' statements at issue in *Innis* that were characterized by the United States Supreme Court as "offhand remarks." 446 U.S. at 303, 100 S.Ct. at 1691, 64 L.Ed.2d at 309. "[T]he police surely cannot be held accountable for the unforeseeable results of their words or actions." *Id.,* 446 U.S. at 301–302, 100 S.Ct. at 1690, 64 L.Ed.2d at 308. We conclude that Tucker was not "interrogated," so that he was not subjected to the "functional equivalent" of questioning. Therefore, his entire statement must be considered to have been voluntarily made.

*State v. Tucker,* 81 Ohio St.3d 431, 692 N.E.2d 171, 176–77 (1998).

The Ohio Supreme Court's discussion of Tucker's mental condition and its application of *Innis* was thorough and sound. It is a well-reasoned explanation for reversing the state appellate court and it provides ample basis for the District Court's rejection of Tucker's Fifth Amendment claim. As such, we reject Tucker's claim about the voluntariness of his confession.[1]

---

1. In his brief, Tucker also claims that jail officials violated his Sixth Amendment right to counsel when they re-initiated questions about his criminal charges. Because Tucker

### b. Admission of Brock's Taped Statements

█ Following the lower courts' lead, the parties assume for the sake of argument that the admission of Brock's taped statements into evidence violated the Sixth Amendment's confrontation clause. Given this posture, the Court turns to the question of whether, in the habeas context, that violation was harmless error. *See Chapman v. California*, 386 U.S. 18, 24, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967). Specifically, the Court must consider whether the harmless error determination of the Ohio Supreme Court was *contrary to clearly* established federal law. *See* 28 U.S.C. § 2254(d)(1).

On collateral review, an error is deemed harmless unless it "had a substantial and injurious effect or influence in determining the jury's verdict." *See Brecht v. Abrahamson*, 507 U.S. 619, 637, 113 S.Ct. 1710, 123 L.Ed.2d 353 (1993) (quoting *Kotteakos v. United States*, 328 U.S. 750, 768, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946); *see also Gilliam v. Mitchell*, 179 F.3d 990, 994–95 (6th Cir.1999) (endorsing the *Brecht* harmless error standard in confrontation clause cases)). If, however, "the matter is so evenly balanced" that this Court has "grave doubt" as to the harmlessness of the error, it "should treat the error, not as if it were harmless, but as if it affected the verdict (i.e., as if it had a 'substantial and injurious effect or influence in determining the jury's verdict')." *O'Neal v. McAninch*, 513 U.S. 432, 435, 115 S.Ct. 992, 130 L.Ed.2d 947 (1995).

Determining whether an error was harmless depends on: (1) "the importance of the witness' testimony in the prosecution's case," (2) "whether the testimony

was cumulative," (3) "the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points," (4) "the extent of crossexamination otherwise permitted," and (5) "the overall strength of the prosecution's case." *Delaware v. Van Arsdall*, 475 U.S. 673, 684, 106 S.Ct. 1431, 89 L.Ed.2d 674 (1986).

At first glance it might seem that Brock's taped statements would be important to the prosecution's case. After all, he was a participant in and eyewitness to Herring's murder. The impact of the taped testimony, however, was severely undercut by Brock's lack of credibility. Throughout the majority of the taped statement Brock denies that he shot Herring. He repeatedly blames Tucker for the murder and then, at the tape's conclusion, admits to shooting Herring–but claims that Tucker threatened him into doing it. The Ohio State Supreme Court correctly concluded that no reasonable jury could give weight to such a "disjointed" and "an improbable effort at self-exculpation". *See Tucker*, 692 N.E.2d at 179.

The remaining factors in this analysis, to the extent they are relevant, likewise show that it was harmless error to admit the tape. Since Burnham had already blamed Tucker for the shooting and Tucker himself admitted guilt, Brock's taped statements were largely cumulative. Moreover, Burnham's testimony and Tucker's confession strongly corroborated the blame Brock placed on Tucker throughout the tape. And while there no was cross-examination, the overall strength of the prosecution's case dictated a guilty verdict here. The physical evidence, the testimony of eyewitnesses, Tucker's admission, and his

---

never raised this claim at the District Court level, we cannot entertain it on appeal. *See United States v. Crismon*, 905 F.2d 966, 969 (6th Cir.1990) (constitutional objections "that

appear for the first time on appeal are conclusively deemed to be waived, with the effect that [the appellate court is] deprived of jurisdiction").

complete failure to refute the State's case could produce no other outcome.

## CONCLUSION

For the reasons stated above, we AFFIRM the District Court's decision.