[Cite as *In re S.W.*, 2022-Ohio-854.]

# IN THE COURT OF APPEALS
# FIRST APPELLATE DISTRICT OF OHIO
# HAMILTON COUNTY, OHIO

| | | |
|---|---|---|
| IN RE: S.W. | : | APPEAL NO. C-210350 |
| | | TRIAL NO. 20-1857X |
| | : | |
| | : | *O P I N I O N.* |

Appeal From:  Hamilton County Juvenile Court

Judgment Appealed From Is:  Reversed and Cause Remanded

Date of Judgment Entry on Appeal: March 18, 2022

*Joseph T. Deters*, Hamilton County Prosecuting Attorney, and *Mary Stier*, Assistant Prosecuting Attorney, for Plaintiff-Appellant,

*Raymond T. Faller*, Hamilton County Public Defender, and *Joshua A. Thompson*, Assistant Public Defender, for Defendant-Appellee.

**MYERS, Presiding Judge.**

{¶1} Thirteen-year-old S.W. was arrested and charged with aggravated robbery, a felony of the first degree if committed by an adult, and accompanying firearm specifications. He filed a motion to suppress statements he made to police at the time of his arrest. Following a hearing, a magistrate granted the motion to suppress S.W.'s statements, which included statements made to two different police officers. The state objected only to the magistrate's suppression of S.W.'s statement to the second officer, asserting that it was not made in response to an interrogation. The juvenile court overruled the objection and adopted the magistrate's decision. The state now appeals.

{¶2} Because the juvenile court erred by finding that S.W.'s statement to police was made during a custodial interrogation, we reverse the juvenile court's judgment.

*Background Facts and Procedure*

{¶3} At the suppression hearing, Cincinnati Police Sergeant Michael Roth testified that he responded to a radio run for an aggravated robbery that occurred in the area of 601 Maple Avenue. Another officer radioed that he saw three individuals running to the back of an apartment building on Maple Avenue, which was close to where the robbery had occurred. As Sergeant Roth entered the front door of the three-story apartment building, he heard what he described as "some wrestling going on up on the top floors."

{¶4} Sergeant Roth walked up the stairs toward the third floor, where he saw three juveniles, one of whom matched the description given in the police dispatch. Sergeant Roth testified that he "had all three at gunpoint" as a matter of officer safety because a handgun had been used in the robbery.

{¶5} Video from Sergeant Roth's body-worn camera was admitted into evidence. It showed that S.W. was the first of the three juveniles that Sergeant Roth ordered to come down the stairs to the landing where he stood. He placed S.W. in handcuffs, asked S.W. if he had "anything else" on him, and asked, "Where's the gun?" After S.W. replied that he did not have a gun, Sergeant Roth again asked, "Where's the gun?" When S.W. responded that he threw it, the sergeant asked him where, and S.W. responded that he threw it in the woods. The sergeant then informed S.W. of his *Miranda* rights and asked S.W. if he understood. S.W. replied, "Yes, sir." Sergeant Roth testified that he believed that S.W. understood what his rights were.

{¶6} Sergeant Roth asked S.W. his age, where he had gotten the gun, and where in the woods he had thrown the gun. He told S.W. that they had better find the gun before someone found it and shot themselves, and told him that he had better start talking about where the gun could be found. As he walked S.W. down the stairs to the building's first floor, he said, "I want to know where you threw it, buddy. 'Cause if not you're in a whole heap of trouble."

{¶7} When they went outside, S.W. indicated that he had thrown the gun behind the building. So Sergeant Roth walked him around the back of the apartment building toward some woods adjacent to the building's rear parking lot. The sergeant continued to ask questions as they walked. Once there, S.W. pointed to an area of the woods, indicating where he had thrown the gun.

{¶8} Sergeant Roth asked S.W. the type and color of the gun, and S.W. replied that it was "a nine" and was silver and black. The sergeant asked S.W. if he was positive that the gun was in the woods because he would only ask him that once. He told S.W. that he was "not going to play games on this," and that "if this is where it is and it's truthful, then then [sic] it's going to go a lot easier on you." S.W. said, "This is where I threw it." After ascertaining the location identified by S.W., the

3

sergeant asked, "You threw it from this parking lot?" S.W. replied, "Yes." Sergeant Roth concluded his interaction with S.W. by telling him, "All right, [S.W.], I'll come back and talk to you in a minute." Sergeant Roth handed S.W. off to Officer Wermuth who was to take S.W. to his cruiser.

{¶9} Officer Wermuth did not testify at the suppression hearing, but video from his body-worn camera was introduced into evidence. The video showed that Officer Wermuth walked S.W. down the driveway from the parking lot behind the apartment building to the sidewalk in front of the building. He did not ask S.W. any questions or engage him in conversation.

{¶10} The officer told S.W., "Right this way," and walked S.W. out into the road near two officers and a civilian for an apparent identification procedure. Neither Officer Wermuth nor either of the other officers asked S.W. anything.

{¶11} Then Officer Wermuth turned and walked S.W. back in the direction of the apartment building and away from the other officers, and he radioed, "14, positive ID." S.W. asked Officer Wermuth what would happen to the stuff in his pockets, and the officer replied, "That's got to stay on you. It'll all go with you and you can pick it up when you get released." They walked back past the apartment building, and the officer asked S.W., "You stay here, sir? Is this a good address for you?," to which S.W. replied no.[1] They continued walking to the officer's cruiser, which was parked several car lengths past the apartment building.

{¶12} Officer Wermuth stopped S.W. at the cruiser and began to pat S.W. down. He pulled what appeared to be a paper packet and a thin cord from S.W.'s left front pants pocket and asked him if it was just a phone charger. The officer put the

---

[1] S.W. does not argue, and the juvenile court did not find, that Officer Wermuth's question about the apartment constituted interrogation. An officer's request for routine information necessary for basic identification purposes is not interrogation unless the officer should have known that it was reasonably likely to elicit an incriminating response. *See United States v. Tapia-Rodriguez*, 958 F.3d 891, 894 (8th Cir.2020) (asking suspect whether he lived in the apartment was a request for routine information and did not constitute interrogation under *Miranda*).

4

items back in the pocket. Then the officer began to pat down S.W.'s right leg, when S.W. suddenly said, "Can you release them? Like, they weren't really like -- I did it, like." Officer Wermuth immediately told S.W. to say nothing and placed him in the cruiser.

{¶13} After the state presented its evidence, S.W. introduced the testimony and report of clinical psychologist Richard Rothenberg, Psy.D., who had conducted an evaluation to determine S.W.'s competency to waive his *Miranda* rights. Dr. Rothenberg opined that, because of age-related, intellectual, and academic limitations, S.W. was not competent to waive his *Miranda* rights. He did not testify that S.W. was incompetent for any other purpose.

{¶14} According to Dr. Rothenberg's report, at the time S.W. waived his *Miranda* rights, he was "chronologically" 13 years and four months old and in the seventh grade. Dr. Rothenberg stated that S.W.'s "language skills and abilities are consistent with those of younger individual [sic], approximately 4 years old and with a grade equivalent of that of an individual in pre-kindergarten."

{¶15} The magistrate granted S.W.'s motion to suppress statements that he made to police, finding that he did not knowingly, intelligently, and voluntarily waive his *Miranda* rights. The magistrate agreed with the state that S.W.'s "I did it" statement to Officer Wermuth was a voluntary statement made without any prompting by police. Nonetheless, the magistrate concluded that S.W. did not fully understand that he had the right to remain silent when Sergeant Roth advised him of his *Miranda* rights. The magistrate suppressed all of S.W.'s statements, which included those made in response to Sergeant Roth's questions and the statement volunteered to Officer Wermuth.

{¶16} The state objected to the magistrate's decision. In its objection, the state did not challenge the decision with respect to S.W.'s waiver of his *Miranda*

rights. The state challenged only the suppression of S.W.'s volunteered statement to Officer Wermuth.

{¶17} The juvenile court found that the magistrate properly suppressed S.W.'s statement to Officer Wermuth, but "clarifie[d] the reasoning." The court determined that S.W. had made the statement involuntarily as part of the prior questioning by Sergeant Roth. The court overruled the state's objection to the magistrate's decision and adopted the decision as its judgment. This appeal followed.

*S.W.'s Volunteered Statement*

{¶18} In its sole assignment of error, the state argues that the juvenile court erred when it granted the motion to suppress S.W.'s volunteered statement to Officer Wermuth because volunteered statements are not subject to exclusion under *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). The state asserts that the court improperly equated S.W.'s spontaneous statement with a waiver of his right to remain silent.

{¶19} Appellate review of a motion to suppress presents a mixed question of law and fact. *State v. Burnside*, 100 Ohio St.3d 152, 2003-Ohio-5372, 797 N.E.2d 71, ¶ 8. The reviewing court must accept the trial court's findings of fact if they are supported by competent, credible evidence, but "must then independently determine, without deference to the conclusion of the trial court, whether the facts satisfy the applicable legal standard." *Id.* Before we review the juvenile court's factual findings, we set forth the appropriate legal standard.

{¶20} The Fifth Amendment to the United States Constitution provides that no person "shall be compelled in any criminal case to be a witness against himself." To protect a person's Fifth Amendment privilege against self-incrimination, the United States Supreme Court announced in *Miranda* that the prosecution may not use statements stemming from a custodial interrogation of the defendant unless it

demonstrates the use of procedural safeguards. *Miranda* at 444. The court explained that its decision did not impact a suspect's volunteered statements:

> The fundamental import of the privilege while an individual is in custody is not whether he is allowed to talk to the police without the benefit of warnings and counsel, but whether he can be interrogated. * * * Volunteered statements of any kind are not barred by the Fifth Amendment and their admissibility is not affected by our holding today.

*Id.* at 478.

{¶21} The *Miranda* safeguards "are not required where a suspect is simply taken into custody, but rather where a suspect in custody is subjected to interrogation." *Rhode Island v. Innis*, 446 U.S. 291, 300, 100 S.Ct. 1682, 64 L.Ed.2d 297 (1980); *State v. Neyland*, 139 Ohio St.3d 353, 2014-Ohio-1914, 12 N.E.3d 1112, ¶ 119 (the requirement of *Miranda* warnings "applies only when a suspect is subjected to both custody and interrogation"). In other words, interrogation "must reflect a measure of compulsion above and beyond that inherent in custody itself." *Innis* at 300.

{¶22} In *Innis*, the United States Supreme Court explained that the *Miranda* safeguards apply when a person in custody is subject to either express questioning or its functional equivalent. *Id.* at 300-301. "[T]he term 'interrogation' under *Miranda* refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." *Id.* at 301. The court explained that the functional-equivalent portion of its definition "focuses primarily upon the perceptions of the suspect," as a reflection of "the fact that the *Miranda* safeguards were designed to vest a suspect in custody with an added measure of protection against coercive police practices[.]" *Id.* The court

emphasized that "the police surely cannot be held accountable for the unforeseeable results of their words or actions[.]" *Id.* at 301-302. So the court set forth a test to determine what constitutes interrogation: "the definition of interrogation can extend only to words or actions on the part of police officers that they *should have known* were reasonably likely to elicit an incriminating response." (Emphasis sic.) *Id.* at 302.

{¶23} The test of whether an interrogation has occurred is an objective one. *United States v. Sanchez*, 13 F.4th 1063, 1074 (10th Cir.2021); *United States v. Tapia-Rodriguez*, 968 F.3d 891, 894 (8th Cir.2020); *United States v. Knope*, 655 F.3d 647, 652 (7th Cir.2011); *United States v. Washington*, 462 F.3d 1124, 1132 (9th Cir.2006); *Rosa v. McCray*, 396 F.3d 210, 222 (2d Cir.2005). Although a police officer's intent may be relevant, the ultimate inquiry is whether the officer should have known that the suspect "would suddenly be moved to make a self-incriminating response." *Innis* at 303; *Sanchez* at 1075, quoting *United States v. Rambo*, 365 F.3d 906, 910 (10th Cir.2004) ("it is the objectively measured tendency of an action to elicit an incriminating response which is ultimately determinative").

{¶24} In *Innis*, the Supreme Court applied its definition to the facts of the case and concluded that the defendant was not "interrogated" within the meaning of *Miranda*. *Innis*, 446 U.S. at 302, 100 S.Ct. 1682, 64 L.Ed.2d 297. In that case, the defendant was arrested on suspicion of killing a man with a shotgun. *Id.* at 294. After the defendant was advised of his *Miranda* rights, he said he wanted to talk to a lawyer. *Id.* Then, as the defendant rode with officers in a police car, two of the officers spoke to each other about the missing shotgun and said that they hoped none of the children at the nearby school for handicapped children found the shotgun and hurt themselves. *Id.* at 294-295. The defendant interrupted the officers and told them that he could show them where the shotgun was located. *Id.* at 295. The Supreme Court held that no interrogation occurred. *Id.* at 302. The conversation

8

between the officers included no express questioning of the defendant, nor its functional equivalent because "[i]t cannot be said, in short, that [the officers] should have known that their conversation was reasonably likely to elicit an incriminating response" from the defendant. *Id.*

{¶25} The Supreme Court rejected the Rhode Island Supreme Court's equating "subtle compulsion" with interrogation because "that is not the end of the inquiry." *Id.* at 303. The defendant's incriminating response must have been "the product of words or actions on the part of the police that they should have known were reasonably likely to elicit an incriminating response." *Id.*

{¶26} In *State v. Tucker*, 81 Ohio St.3d 431, 438, 692 N.E.2d 171 (1998), the Supreme Court of Ohio applied *Innis*'s functional-equivalent test in holding that a prisoner was not subject to interrogation by corrections officers when he implicated himself in a murder. The officers moved the prisoner, who had been watching a newscast about his codefendant's trial, away from other prisoners, because they noticed that he was nervous and not himself. *Id.* at 434. Officers gave the prisoner a cigarette and a soda, and asked him if he wanted them to have a mental-health professional come to the jail, because they knew he had undergone some mental-health counseling while he was in jail. *Id.* The prisoner declined and began talking about his codefendant's trial, saying he wished "this would just get over" so he could "start [his] time." *Id.* at 434-435. He said he would plead guilty unless his co-defendant got the death penalty. *Id.* at 435. One of the officers remarked that "when this is all said and done, I'd like to hear about what happened that day." *Id.* The prisoner said he would tell him "right now," and an officer said that he did not have to, but the prisoner continued to describe the crimes he had committed. *Id.*

{¶27} The Supreme Court held that the prisoner was not subjected to interrogation because "the officers reasonably should not have anticipated that their actions or words would be likely to evoke an incriminating response." *Id.* at 437.

The court held that the prisoner voluntarily turned the conversation toward the subject of the murder, and that any further interaction with the officers was a continuation of the conversation and flowed from his initial volunteered incriminating statement. *Id.*; *see State v. Martin*, 151 Ohio St.3d 470, 2017-Ohio-7556, 90 N.E.3d 857, ¶ 89-92 (*Miranda* did not require suppression of statements made by defendant in custody before he was advised of his rights, because he was not subjected to interrogation and his statements were "unsolicited, spontaneous, and 'not in response to any inquiries of law enforcement.' ").

{¶28} Here, it is undisputed that S.W. was in custody at the time he made the statement. The question is whether the statement was made in response to an interrogation. In determining that S.W. was subject to interrogation at the time he made the statement to Officer Wermuth, the juvenile court made the following factual findings: the statement was made within minutes of the original questioning by Sergeant Roth; S.W. was in handcuffs; he was in the same physical location and had not yet been placed in a cruiser; he had been subjected to an identification procedure; and no intervening conversation or action had occurred between the *Miranda* warning, the questioning by Sergeant Roth, and the statement. The court concluded that S.W. was subject to interrogation when he made the statement to Officer Wermuth because it was made "as part of the prior questioning by [Sergeant] Roth," and "[i]t was one continuous experience, especially for a child with limited functioning and language skills."

{¶29} However, like the officers in *Innis* who had no reason to know whether the suspect was "peculiarly susceptible to an appeal to his conscience concerning the safety of handicapped children," *Innis*, 446 U.S. at 302, 100 S.Ct. 1682, 64 L.Ed.2d 297, nothing in the record before us suggests that the police were aware that the 13-year-old S.W. had either limited reasoning skills or was low functioning. To the contrary, when the prosecutor asked Sergeant Roth whether S.W.'s responses "were

appropriate for the questions you were asking," the sergeant responded, "Yes. He gave the same description of the gun that the victim had given." In addition, nothing in S.W.'s interaction with Officer Wermuth, which included S.W.'s question about the items in his pocket and his response to the officer's question about whether he stayed at the apartment building, suggested that the officer should have known that S.W. had any cognitive deficits.

{¶30} We hold that the facts of this case demonstrate that S.W. was not interrogated by Officer Wermuth within the meaning of *Miranda.* There was a clear break after Sergeant Roth's questioning, where S.W. was walked by Officer Wermuth to an identification procedure and then to his cruiser. Sergeant Roth was not present, and Officer Wermuth did not ask S.W. any questions. More than two minutes passed with no interrogation, before S.W. made his admission to Officer Wermuth.

{¶31} It is clear that neither prong of the definition of "interrogation" announced in *Innis* was satisfied, because S.W.'s statement to Officer Wermuth was not triggered by an express question or by its functional equivalent. S.W. was not subjected by Officer Wermuth to words or actions that the officer should have known were reasonably likely to elicit an incriminating response from S.W. *See Innis* at 303. Nothing in the record suggests that Officer Wermuth should have known that S.W. "would suddenly be moved to make a self-incriminating statement." *See id.* Rather, S.W.'s statement was "unsolicited, spontaneous, and 'not in response to any inquiries of law enforcement.' " *See Martin*, 151 Ohio St.3d 470, 2017-Ohio-7556, 90 N.E.3d 857, at ¶ 89. When S.W. made the statement to Officer Wermuth, he was in custody but he was not subjected to interrogation. "Therefore, '*Miranda* does not apply.' " *Id.* at ¶ 92, quoting *State v. Dunn*, 131 Ohio St.3d 325, 2012-Ohio-1008, 964 N.E.2d 1037, ¶ 24. Consequently, the juvenile court erred by suppressing the statement.

*Conclusion*

**{¶32}** Therefore, we sustain the state's assignment of error, reverse the juvenile court's judgment granting the motion to suppress S.W.'s statement to Officer Wermuth, and remand the matter for further proceedings consistent with the law and this opinion.

*Judgment reversed and cause remanded.*

**WINKLER, J**., concurs.
**BERGERON, J**., dissents.

**BERGERON, J**., dissenting.

**{¶33}** The majority essentially frames the inquiry in this case as a legal one designed to ascertain "whether an interrogation has occurred." Majority opinion at ¶ 23. Here, however, there is no question that a custodial interrogation occurred—rather, the question presented is whether that interrogation was on-going at the point of S.W.'s statement. On that point, I submit, this implicates a factual question, which we must review with deference to the factfinder. *See State v. Banks-Harvey*, 152 Ohio St.3d 368, 2018-Ohio-201, 96 N.E.3d 262, ¶ 14 ("Appellate review of a ruling on a motion to suppress presents a mixed question of law and fact. * * * An appellate court must accept the trial court's findings of fact if they are supported by competent, credible evidence."). As federal courts have recognized, "when it is determined that officers engaged in interrogation, whether the suspect's statement was spontaneous (or instead made as a result of the interrogation) is a factual finding that we review for clear error." *United States v. Yepa*, 862 F.3d 1252, 1258 (10th Cir.2017). The trial court here provided a thorough analysis as to why it believed that S.W.'s statement was part and parcel of his custodial interrogation. In light of the

12

record support for this point, we should not quibble with the trial court's factual findings, and therefore I respectfully dissent.

{¶34} Before embarking on the analysis, I pause to consider Dr. Rothenberg's evaluation of S.W. so that the reader may fully appreciate S.W.'s limitations. Dr. Rothenberg, the clinical psychologist who examined S.W., witnessed deficiencies across the board in S.W.'s mental capacity. In his assessment, Dr. Rothenberg utilized a set of four *Miranda* Rights Comprehensive Instruments to evaluate S.W.'s understanding and appreciation of his *Miranda* rights. The first instrument measured S.W.'s ability to paraphrase each *Miranda* right after providing them to him orally and in writing. In paraphrasing his right to remain silent, S.W. thought "right" referred to writing with his hand. When asked about his understanding of the right to have a lawyer present, S.W. thought "present" meant a gift. S.W. scored zero points on the first instrument. Dr. Rothenberg didn't bother administering the second instrument because S.W. could not even understand the directions. On the third instrument, measuring S.W.'s appreciation of his *Miranda* rights, S.W. scored 11 out of 30 points, placing him in the bottom 0.6th percentile of the juvenile sample. The last instrument asked S.W. to define 16 *Miranda*-related words. He scored 2 points out of a possible 32, defining "right" by saying "we write in class but I don't have a pen" and "present" by referring to Christmas. Overall, Dr. Rothenberg found S.W. to be illiterate and in significant need of educational intervention, with an extremely low average intellectual functioning that may meet the criteria for an intellectual disability. Dr. Rothenberg further concluded that, during his encounter with the officers, S.W. "does not appear to exhibit an appreciation of the fact that he is not obligated to help the police in this situation as

it may be self-incriminating and detrimental to him and his legal defense." No evidence contradicted any of these conclusions.

{¶35} We thus have a juvenile with the intellectual functioning of a four-year-old, according to Dr. Rothenberg. Apprehended by multiple officers at gunpoint and immediately placed in handcuffs, S.W. relayed being "scared" by that experience and equated it with a "kidnapping." And when the officer administered the *Miranda* warnings in that environment, he did so in such a mumbled, rushed fashion that even the most astute juvenile probably had little chance of understanding it. These facts form the underpinning for the *Miranda* violation conclusion that the state does not challenge on appeal. The state, however, endeavors to forge a distinction between the aspect of the interrogation tainted by the *Miranda* violation with that surrounding the "I did it" statement, a premise that the majority accepts.

{¶36} To understand the crux of my disagreement with the majority's opinion, it is helpful to consider the caselaw featured in their opinion. *Innis* involved a defendant who invoked his *Miranda* right to an attorney before any custodial interrogation occurred, and while the officers respected that invocation, as they were discussing the crime amongst themselves, the defendant chimed in and confessed. *Rhode Island v. Innis*, 446 U.S. 291, 294, 100 S.Ct. 1682, 64 L.Ed.2d 297 (1980). In other words, no interrogation occurred. Likewise, the defendant in *Tucker* was never subject to any interrogation, and no *Miranda* warnings were given, rendering his entire statement voluntary. *State v. Tucker*, 81 Ohio St.3d 431, 435, 692 N.E.2d 171 (1998). The defendants in *Knope, Washington,* and *Tapia-Rodriguez* all objected to routine biographical information given pre-*Miranda* warnings and before the commencement of any custodial interrogation. *United States v. Knope*, 655 F.3d 647

14

(7th Cir.2011), *United States v. Washington*, 462 F.3d 1124 (9th Cir.2006), *United States v. Tapia-Rodriguez*, 968 F.3d 891 (8th Cir.2020). The *Rosa* and *Sanchez* defendants were never provided *Miranda* warnings because they were never subject to custodial interrogation. *Rosa v. McCray*, 396 F.3d 210 (2d Cir.2005), *United States v. Sanchez*, 13 F.4th 1063 (10th Cir.2021). The cases cited by the majority generally contemplate voluntary statements made in the absence of interrogation or before an interrogation. They do not evaluate a defendant already being interrogated for purposes of *Miranda* in conjunction with whether, based on the totality of the circumstances, the defendant would have understood that the interrogation was on-going. *See State v. Johnson*, 2d Dist. Greene No. 86-CA-0084, 1987 Ohio App. LEXIS 7677, *11 (June 25, 1987) ("The determination of whether interrogation is 'custodial interrogation' is a factual determination that depends upon the totality of the circumstances."). These cases certainly do not suggest that we should parse S.W.'s brief walk to the car with Officer Wermuth into something entirely separate from the custodial interrogation that Sgt. Roth commenced.

{¶37} And while the majority describes the test as an objective one, majority opinion at ¶ 23, it must be evaluated from the suspect's perspective: "The suspect's state of mind is the key." *State v. Farris*, 109 Ohio St.3d 519, 2006-Ohio-3255, 849 N.E.2d 985, ¶ 35. That point is reinforced by the caselaw cited by the majority. *Sanchez* at 1074 ("This inquiry is objective, focusing 'on the perceptions of a reasonable person in the suspect's position rather than the intent of the investigating officer.' "); *Tapia-Rodriguez* at 891 ("The 'should have known' standard is objective and 'focuses primarily upon the perceptions of the suspect, rather than the intent of the police.' "), quoting *Innis* at 894; *Rambo* at 906 ("The focus is on the perceptions

of a reasonable person in the suspect's position rather than the intent of the investigating officer.").

{¶38} Consistent with this caselaw, the question we should be asking is whether a 13-year-old juvenile with the mental functioning of a four-year-old should have understood that the interrogation had concluded when Sgt. Roth handed him over to Officer Wermuth. " 'Because voluntariness is a matter of the suspect's state of mind, we focus our analysis on the way in which [S.W.] experience[d] interrogation.' " *See Farris* at ¶ 34, quoting *Missouri v. Seibert*, 542 U.S. 600, 624, 124 S.Ct. 2601, 159 L.Ed.2d 643 (2004) (O'Connor, J., dissenting). The juvenile court, in my view, conducted the correct analysis and made factual findings supported by the record. *Id.* at ¶ 21, quoting *Seibert,* at 612, fn. 4 (Where virtually identical inculpatory statements are given before and after an officer's recitation of *Miranda* rights, "the postwarning statements are inadmissible because 'the earlier and later statements are realistically seen as parts of a single, unwarned sequence of questioning.' ").

{¶39} The trial court found, as a factual matter, that the interrogation did not end with Sgt. Roth's handoff of S.W. to Officer Wermuth, and factual determinations surrounding the circumstances of an interrogation are "entitled to a presumption of correctness." *State v. Pudelski*, 8th Dist. Cuyahoga No. 77172, 2001 Ohio App. LEXIS 1150, *21 (Mar. 15, 2001). The state and majority opinion both suggest that a clear break occurred between Sgt. Roth's and Officer Wermuth's interactions with S.W., and reasonable minds could disagree on this interpretation of this evidence, which is exactly why I would defer to the trial court. Consistent with the body-worn camera footage and the trial court's findings, the video documents a series of questions by Sgt. Roth to S.W. about the gun, including an interrogation question

16

asked in the midst of Officer Wermuth tightening the handcuffs on S.W.—lending further credence to the notion that S.W. would have no reason to believe his interrogation was over. And Officer Wermuth kept questioning S.W. as they walked, albeit not questions designed to elicit inculpatory responses. Most critically, the last thing Sgt. Roth said to S.W. before Officer Wermuth walked him towards yet another group of officers waiting in the street was, "All right, [S.W.], I'll come back and talk to you in a minute." That statement on its own would lead any reasonable person to conclude that the custodial interrogation was not over, particularly a 13-year-old with limited reasoning skills. The line the majority attempts to draw "cannot be said to be bright or sharply defined," *Farris*, 109 Ohio St.3d 519, 2006-Ohio-3255, 849 N.E.2d 985, at ¶ 22, all the more reason we should defer to the fact-finder.

{¶40} We also must consider S.W.'s statement—"I did it." Although the state charged S.W. with aggravated robbery, at no point in time did Sgt. Roth or any other officer question S.W. about a robbery. All of Sgt. Roth's questions, from start to finish, revolved around whether S.W. had a gun and the whereabouts of the weapon. These questions were designed to "evoke an incriminatory response," *Tucker,* 81 Ohio St.3d at 437, 692 N.E.2d 171, and they succeeded—S.W. repeatedly made inculpatory comments in response to the questioning, as the majority details. The subsequent statement "I did it" thus only relates logically to what S.W. had already confessed—he had a gun and tossed the weapon away. And after determining that those inculpatory statements to Sgt. Roth must be suppressed according to *Miranda* and its progeny, I have difficulty understanding how the subsequent statement (coming moments after the earlier confession) merits a different fate. Even to the extent that we consider S.W.'s interactions with Sgt. Roth and Officer Wermuth separately, "[i]t would have been reasonable to regard the two sessions as parts of a

17

continuum"—precisely as the trial court concluded. *Seibert,* 542 U.S. at 616-617, 124 S.Ct. 2601, 159 L.Ed.2d 643.

**{¶41}** On this record, the trier of fact determined S.W. to still be subject to interrogation, and competent and credible evidence supports that conclusion. I accordingly respectfully dissent and would affirm the trial court's judgment.

Please note:

The court has recorded its own entry this date.